### In re MESTA MACHINE COMPANY, Debtor.

**UNITED STEELWORKERS OF AMERICA, John T. Beynon and Russell G. Bingham, Petitioners,**

**v.**

**Robert O. LAMPL, John M. Silvestri, the Hourly Employees Committee, Mihrr Corporation, Patrick J. McMahon, Anthony Iarussi, Lawrence Herlock, Raymond Riddle and Donald Rottman, Respondents.**

**Bankruptcy No. 83–319.**

United States Bankruptcy Court, W.D. Pennsylvania.

June 30, 1986.

Supplemental Memorandum Opinion July 24, 1986.

Frank J. Lucchino, Dennis J. Roman, Grogan, Graffam, McGinley & Lucchino, P.C., Pittsburgh, Pa., for United Steelworkers.

Paul M. Singer, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for debtor.

Bernhard Schaffler, Schaffler & Bohm, Pittsburgh, Pa., for Committee of Unsecured Creditors.

James A. Ashton, Pittsburgh, Pa., for Hourly Employees Committee.

Stanley E. Levine, Campbell & Levine, Pittsburgh, Pa., for Committee of Salaried Employees.

P. Brennan Hart, Pittsburgh, Pa., for Committee of Equity Holders.

David A. Murdoch, Kirkpatrick Lockhart, Pittsburgh, Pa., for Mellon Bank, Pittsburgh Nat. Bank and Union Nat. Bank.

James A. Lewis, James R. Farley, Rothman, Gordon, Foreman & Groudine, P.A., Pittsburgh, Pa., for John M. Silvestri.

Joseph J. Bernstein, Bernstein & Bernstein, Pittsburgh, Pa., for Robert O. Lampl.

Robert J. Cindrich, Mansmann Cindrich & Huber, Pittsburgh, Pa., for Edward A. Olds.

## MEMORANDUM OPINION

### MOTION FOR ACCOUNTING

JOSEPH L. COSETTI, Bankruptcy Judge.

On May 17, 1985, the United Steelworkers of America ("United Steelworkers") petitioned for an accounting. Judge Gibson died in early June before he could set this petition for a hearing. A hearing was set for July 31, 1985, which was continued until August 28, 1985. On August 28, 1985 the Court conducted a hearing and ordered an accounting by the representatives of the Mesta Hourly Employees Committee, their attorneys and the MIHRR Corporation, its officers, directors, stockholders, principals, incorporators and attorneys. The Respondents indicated they needed approximately 40 days to account, which was granted. The Respondents were Ordered to account by October 1, 1985.

The Respondents filed an appeal of the Order for an accounting. This Order to account was not stayed by the District Court, nor was a request made of the Bankruptcy Court to stay the Order.

On October 22, 1985, an accounting was filed by Robert O. Lampl, and on October 28, 1985, John M. Silvestri filed an accounting. The class representatives have not filed an accounting. A supplemental accounting by Robert O. Lampl and Patrick McMahon was filed on December 20, 1985.

The United Steelworkers did not believe the accountings filed were complete or that they complied with the Court Order. In order to learn about these matters, they proceeded to take the depositions of the class representatives. The class representatives initially resisted the depositions.

On February 28, 1986, District Court Judge Weber denied the appeal, filed a Memorandum Opinion and ordered the Respondents to account no later than March 15, 1986.

On May 12, 1986, based on their examination of the class representatives and the documents filed by Robert O. Lampl and John M. Silvestri, the United Steelworkers moved to compel repayment of the money distributed to the MIHRR Corporation, etc. and filed an extensive report in support of their motion. The Court gave the Respondents an opportunity to respond by accounting further and set a hearing for June 16, 1986 on the motion to compel repayment. No further accounting was filed prior to the hearing.

On the day of the hearing, John M. Silvestri filed an Answer supplying counterstatements to the United Steelworkers' Report.

The Respondents raised the following motions at the June 16, 1986 hearing: Motion to Hold Pretrial Conference; Motion to Withdraw Reference; Motion to Dismiss Questioning Subject Matter Jurisdiction; Motion to Dismiss Questioning in Personam Jurisdiction; Motion to Dismiss Failure to Join Indispensable Parties; Motion to Dismiss for Failure to State a Claim for Which Relief can be Granted; Motion to Dismiss the Plaintiff's Lack of Standing; Motion to Dismiss Statute of Limitations and Laches; Motion to Strike Report; Motion to Determination of Right to Trial by

Jury; Motion for Stay; Motion for Leave to Join Additional Parties; and Motion for an Adversary Proceeding. These motions were denied, except for the Motion to Proceed as a Status Conference, which was not denied but continued. Many of these motions repeated the legal arguments which were raised on appeal and had been raised in August of 1985.

In the Memorandum accompanying the Order for accounting dated August 28, 1985, the Bankruptcy Court clearly set forth its authority to reopen the case pursuant to 11 U.S.C. § 350(b). The Court set forth its view that the creation of the MIHRR Corporation in the Mesta Plan could only be explained as a dividend for the benefit of the creditors, the Hourly Employees Class. The Court set forth its belief that the class representatives and their co-counsel were fiduciaries to that class. On appeal, District Judge Weber also clearly sets forth his view that the Respondents here were fiduciaries with a duty to account. Judge Weber further notes that their "frenetic opposition" to such an accounting shocks the conscience of this Court.

The Order for accounting dated August 28, 1985 required the Respondents to provide the name, the number and the location of the bank accounts that were used to disburse the money; the list of all recipients, their addresses, the amount paid, showing date paid with a copy of the check showing both payee and endorsement; and an explanation of the service or product received for each payment. The Order required only a bare minimum of information required of fiduciaries.

We now find that the Respondents have not complied with that Order.

· The Court has three incomplete accounting reports, which will be discussed briefly. The accounting report of Robert O. Lampl dated October 28, 1985 contains the bulk of the expenditures and lists two large deposits into his *client trust fund* for $200,000 and $250,000 on October 19, 1984. It reports many disbursements to many parties in round numbers. For example, the class representatives, Lawrence Herock, Raymond Riddle and Donald Rottman, received $40,000; Anthony Iarussi received $60,000; and Patrick J. McMahon received $70,000. The deposition of McMahon by the United Steelworkers reports that McMahon did not receive $70,000 but received approximately $35,000. Apparently Lampl's client trust account continues to hold the remainder.

Lampl reports that Edward A. Olds was paid $18,000 from the client trust account. Olds, by an unsolicited separate report, admits that he received $18,000, but he asserts that the $18,000 was owed to him by Lampl for legal work as an employee in the main case. Olds made no demand on the MIHRR Corporation for payment.

Frederick B. Kruger, Lampl's father-in-law, is reported to have received $26,650.94. By deposition, Pittsburgh National Bank reports being paid a similar sum of money as the balance of a debt for a car owned by Lampl. It is believed that Lampl later transferred this automobile to his father-in-law as payment for services rendered by Kruger to the MIHRR Corporation.

James A. Ashton, who is now acting as counsel to the class representatives, is reported to have received $20,000. No explanation for this expenditure is provided. Janice Morison is reported to have received $5,000. No explanation for this expenditure is provided. The relationship of Ashton and Morison to Lampl and his law practice is not known with precision. The Court takes judicial notice that Morison frequently substitutes for Lampl as counsel in his cases. It is believed that Ashton shares office space, services, etc. with Lampl's law office.

Many of the checks attached to the accounting are made to cash. The checks for cash appear to have been cashed by an employee of Lampl's office at his bank. Presumably the cash was taken to Lampl's office and disbursed. Helen Lampl, wife of Robert O. Lampl and an employee in his office, signed the checks and is reported to have disbursed the cash.

Lampl's accounting reports that Lampl received $49,293.76. No check or transfer is shown which would identify that expenditure. This October 28 document labeled an accounting is not signed by Lampl. The written explanations provided for the various expenditures often consist of a single word or phrase and are inadequate.

The October accounting reported the receipt and expenditure of only $450,000. The United Steelworkers requested additional accounting reports for two $20,000 authorizations to the Committee. On December 20, 1985, an accounting of $40,000 was provided. This accounting is signed by both Robert O. Lampl and Patrick McMahon. The December 20 accounting consists of a list of expenditures sometimes identifying the party paid and the amount paid with a limited explanation of the purpose of the payment. This December 20 accounting is inadequate and incomplete and appears to be in conflict with the explanations provided by the class representatives in their various depositions.

The December 20 report admits payments were made to the class representatives, to Quaker State Land Company, which is a company owned or controlled by Robert O. Lampl, and reports two payments to Robert O. Lampl of $7,000 and $2,000. No copies of checks are provided.

John M. Silvestri submitted an accounting and reports that he received $50,000 for professional services rendered to the MIHRR Corporation. He reports that he did not disburse the remainder of the money. The depositions report that he participated in the recommendations and advice provided related to disbursal.

The five representatives of the class, McMahon, Iarussi, Rottman, Riddle and Herock, did not file an accounting. On June 16, 1986, when Ashton, their attorney, was questioned about this, his answers were evasive and hostile. Ashton, as their counsel, offered the depositions taken by the United Steelworkers as their accounting.

During the June 16, 1986 hearing, the Respondents requested an opportunity to file applications with this Court in the manner required of fiduciaries for payment for the services they rendered. The Court will be happy to receive such applications. However, such applications are to be made in such detail that the application would also serve as a proper accounting. The Court has been requesting such detailed materials since August of 1985. These seven Respondents have avoided such a detailed accounting for eight months.

The fee applications of the class representatives and their counsel will be considered on the basis of their status as fiduciaries. We believe this Court, the District Court, the Court of Appeals and the Supreme Court of the United States have made it clear under similar circumstances that such parties are fiduciaries. A brief review of the law follows.

■ The Hourly Employees Committee was a special subclass of unsecured creditors appointed by the Bankruptcy Court on the motion of the Respondents to represent this special class. It is well established law that members of all creditor committees in bankruptcy cases have a fiduciary responsibility to the creditors represented. Specifically in this case, counsel and members of the Hourly Committee owe a fiduciary duty to the individual Hourly Employees.

■ As fiduciaries, counsel and committee members have obligations of fidelity, undivided loyalty and impartial service in the interest of the creditors they represent. 5 Collier on Bankruptcy ¶ 1103.07. Section 1103(c)(5) of the Bankruptcy Code provides that a committee may perform such other services *as are in the interest of those represented.* Obviously conflicting interests and services are not allowed.

The Supreme Court has unequivocally found that creditors' committees and counsel are fiduciaries.

In *Woods v. City National Bank*, 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820 (1941), the Supreme Court held that a creditors' committee in a corporate reorganization were fiduciaries. 61 S.Ct. at 497. Commit-

tee members and counsel to the committee must have undivided loyalty to those whom they represent without any conflict of interest. *Id.*

The Court of Appeals for the Third Circuit similarly held in *In re Mountain States Powers Co.,* 118 F.2d 405, 407 (3rd Cir.1941), that members and officers of a creditors' committee assume a fiduciary relationship to those whom they represent. Both the *Woods* and the *Mountain States Powers Co.* decisions refer to Judge Cardozo's opinion in *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545, 546 (1928), where he says:

> Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden by those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. * * * Only thus has the level of conduct for fiduciaries been kept a level higher than that trodden by the crowd.

In *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), a bankruptcy case, the Supreme Court emphasized the undivided duties of a fiduciary:

> He who in such a fiduciary position cannot serve himself first and his cestui second. He cannot manipulate the affairs of his corporation to their detriment and in disregard of the standards of common decency and honesty. He cannot by the intervention of a corporate entity violate the ancient precept against servicing two masters. 60 S.Ct. at 247

■ A committee member violates his fiduciary duty by using his position to further self interest. For example, in *Magruder v. Drury,* 235 U.S. 106, 119, 35 S.Ct. 77, 82, 59 L.Ed. 151 (1914), the Supreme Court held that a trustee breached his fiduciary duties when he invested estate funds to make a personal profit for himself. See DeNatale, "The Creditors' Committee Under the Bankruptcy Code—A Primer", 55 Am. Bank. L.J. 43, 56–58 (1981).

■ A fiduciary's dealings with those it represents are subject to rigorous scrutiny. Where any of its transactions are challenged, the burden is on the fiduciary not only to prove the good faith of the challenged transaction but also to show its inherent fairness from the viewpoint of those that the fiduciary represents. *Pepper v. Litton, supra,* 60 S.Ct. at 245.

The respondent fiduciaries must show their good faith and fairness by an accounting with convincing clarity. The Court need not compromise these standards. "In the exercise of its equitable jurisdiction, the Bankruptcy Court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." *Id.* 60 S.Ct. at 246.

■ In this case where the class representatives are unsophisticated and unemployed, their counsel have special duties. Counsel to a creditors' committee owes a fiduciary duty to the committee and the individual creditors that the committee represents. Counsel may not represent any other entity having an adverse interest to these parties in connection with the case under Section 1103(b) of the Bankrupcty Code. 5 Collier on Bankruptcy ¶ 1103.03. Section 1103(b) was designed to prevent potential conflicts of interest, and to avoid even the appearance of impropriety. House Report No. 95–595, 95th Cong. 1st Sess. 402 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5787, 6358. "The language of the section essentially states a malum prohibitum rule which allows for no exceptions." *In re Broadcast Management Corp.,* 36 B.R. 519, 520 (Bkrtcy. S.D.Ohio W.D. 1983) (denial of counsel fees when conflict of interest existed). Section 1103(b) does not specifically require attorneys to be "disinterested persons" under section 101(13) of the Code. However, if

counsel is not a "disinterested person",[1] compensation for services rendered and reimbursement for expenses incurred may be denied by the court under Section 328(c) of the Code unless adequate disclosure is made and prior approval of the court is obtained. 5 Collier on Bankruptcy ¶ 1103.-04. An attorney representing a creditors' committee should not place himself in a position where he is serving dual or conflicting duties. *Woods v. City National Bank, supra.*

■ Counsel to a creditors' committee directly owes fiduciary duties to the Court and to the creditors' committee as officers of the Court. *Matter of Arlan's Dept. Stores, Inc.,* 615 F.2d 925, 941, 943–44, (2nd Cir.1979).

In *Baker v. Humphrey,* 101 U.S. (11 Otto) 494, 502, 25 L.Ed. 1065 (1879), the Supreme Court referred to the professional obligation of attorneys as follows:

> They are officers of the law, as well as the agents of those by whom they are employed. Their fidelity is guaranteed by the highest considerations of honor and good faith, and to these is superadded the sanction of an oath. The slightest divergence from rectitude involves the breach of all these obligations. None are more honored or more deserving than those of the brotherhood who, uniting ability with integrity, prove faithful to their trusts and worthy of the confidence reposed in them. Courts of justice can best serve both the public and the profession by applying firmly upon all proper occasions the salutary rules which have been established for their government in doing the business of their clients.

Silvestri has consistently argued that where the October 10, 1984 Order transferred $450,000 from the Mesta estate to the MIHRR Corporation, the MIHRR Corporation either no longer or never had a fiduciary relationship to the individual members of the class. The Court rejects this argument for many legal and factual reasons.

First, Ashton, when representing the MIHRR Corporation in an injunction hearing in the Court of Common Pleas for Allegheny County, argued to that Court and admitted that the MIHRR Corporation and the five class representatives "are acting in a fiduciary capacity for the hourly employees of the Mesta community" in this bankruptcy case. *MIHRR Corporation v. Park Corporation,* Court of Common Pleas of Allegheny County, C.D. No. 84–2476, transcript of trial on May 29, 1984 at page 193. Ashton identifies the principals in MIHRR Corporation with having the "legal status of such creditors' committee" under the Bankruptcy Code. *Id.* at 193–194.

This Court also believes that to determine that the MIHRR Corporation did not have a continuing fiduciary relationship to the Hourly Employees Class would only create further serious legal obstacles for these Respondents. Under all these circumstances, if this Court made such a holding or finding, we would be compelled to inquire further as to whether the motion requesting the October 10, 1984 Order constituted a fraud upon the Court and the class and whether the filing of such a motion by class counsel was a breach of their fiduciary duties to the individual class members. Such a breach would be grounds to recoup the $359,092.30 counsel fees which were paid to faithfully represent this class.

It is important to examine the circumstances which surrounded the October 10, 1984 Order. Prior to the October 10, 1984 Order, the individual members of the hourly class had an absolute right through a confirmed Plan to either the creation of the

---

1. The term "disinterested person" is defined in § 101(13)(E) of the Code as follows:

 (13) disinterested person means person that—
 
 \* \* \* \* \* \*
 
 (E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason.

MIHRR Corporation as an ESOP and the purchase of the West Homestead plant or to the return of their $500,000. The October 10, 1984 Order was not obtained at a hearing in open court with notice to individual members of the class. It was an unscheduled matter and conducted in chambers. Notice was provided only to other classes, such as the committee of unsecured creditors, the equity holders, etc. However, none of these parties was being affected by the change. The United Steelworkers allege their representative did not receive notice of this in-chambers hearing and did not receive a copy of the signed order in time to appeal. This has not been proven. It is admitted that the individual class members did not receive notice and an opportunity to object or vote, etc.

Proper disclosure was important and did not occur. On the day of the October 10, 1984 hearing, counsel and the class representatives knew that Mellon Bank, the principal bank with whom they were negotiating a loan, would not grant the loan. The likelihood of success of this ESOP became very limited. This was known to the fiduciaries but not disclosed to the individual class members.

Additionally, the October 10, 1984 Order relieved Mesta Corporation from purchasing $906,000 of preferred stock in the MIHRR Corporation, which was to be created for the benefit of the class. In return for not purchasing $906,000 of this preferred stock, Mesta transferred $200,000 to MIHRR Corporation. These events reduced in a significant manner the future possibilities of creating an ESOP. This was not disclosed to the individual class members. We now know that large fee petitions were about to be paid and this was not disclosed.

The Order of October 10, 1984 transferred directly to the class members only $250,000 of the $500,000 owed to them. It transferred the other $250,000 of their money to the MIHRR Corporation, which they now argue is not their fiduciary.

By any standard, the October 10, 1984 Order was a substantial modification of the Plan as it affected the distribution to the Hourly Employees. Under these circumstances, the Bankruptcy Code requires disclosure, notice and solicitation of acceptance. Section 1127(b) provides for the modification of the Plan after confirmation and before substantial consummation. The Plan had been confirmed, but substantial consummation had not occurred.

Section 1127(c) of the Bankruptcy Code requires the *proponents* of a modification of a plan of reorganization to comply with the disclosure requirements of section 1125. The legislative history to section 1127(c) states that "if the modification were sufficiently minor, the court might determine that additional disclosure was not required under the circumstances." House Report No. 95–595, 95th Cong., 1st Sess. 411 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5787, 6367.

■ Where the modification of the plan is not proposed by the Debtor but by the committee representatives of a special class, and where the modification will reduce the distribution to their clients, the special class, and where we now know that the members and their counsel were about to personally benefit thereby, this is certainly a substantial modification. Counsel and committee members were required to give notice of the modification with an approved disclosure statement and solicit acceptance of the modification.

In this case we believe counsel and members of the Hourly Committee had an *independent fiduciary duty* to notify the individual hourly employees of the modification their fiduciaries were seeking that would reduce their distribution *before they proposed* such a change to this Court. If the MIHRR Corporation is not a successor fiduciary to the individual members of this class, then the filing of that motion without notice and without a vote of the class members constitutes a possible fraud on the Court and the class and certainly a breach of their fiduciary duties to the class for which they were paid approximately $359,092.30. We avoid those troublesome issues and treat the MIHRR Corporation as a

successor fiduciary entity. Until the MIHRR Corporation became an independent operating corporation, owning the West Homestead plant, with its own public stockholders and its own separate identity in compliance with the securities laws of the United States and Pennsylvania, it had a continuing fiduciary obligation to the hourly class. Unfortunately, MIHRR never reached such an independent status. The circumstantial evidence would indicate that by early October the possibility for achieving such a status became very limited.

Other circumstantial evidence about the disbursements are very troubling. This October 10, 1984 Order was docketed on October 11, 1984. It would not be a final order for 11 days, because an appeal could have been raised until October 21, 1984. Actually October 21 was a Sunday, and an appeal could be raised until October 22, 1984.

Nevertheless, Mesta disbursed $450,000 to MIHRR Corporation on October 19, 1984. Kruger was paid on October 19, 1984. McMahon received a partial payment of $10,000 on October 22, 1984. Olds was paid on October 19, 1984. Payment to Pittsburgh National Bank was made on October 19 and October 30, 1984. A few payments to the class representatives were reported on October 22, 1984. Morison was paid on October 22, 1984. Ashton was paid on October 22, 1984. Silvestri was paid on October 19, 1984.

▆▆ For all of these reasons, therefore, this Court Orders the immediate repayment to the Clerk of the Bankruptcy Court of all monies received by both counsel and by the five class representatives in whatever form that it was received from the MIHRR Corporation. If the representatives of the class and the co-counsel desire to be paid for their services, they are to make application for this money and to describe in detail the services performed, dates, etc.

In addition, these fiduciaries are to provide further accounting of their roles in the monies expended to others.

Appropriate Orders will issue.

## ORDER OF COURT AND NOTICE OF HEARING

AND NOW, this 30 day of June, 1986, upon the basis of the Memorandum Opinion of even date herewith, IT IS HEREBY ORDERED, ADJUDGED and DECREED:

1. That the fiduciaries of the Hourly Employees Class return to the Clerk of the Bankruptcy Court by July 10, 1986 the following funds, which they admit paying to themselves or to parties associated with them without disclosure and application to the Court:

| (a) | Patrick J. McMahon | $70,000.00 |
| | | 750.00 |
| | | 652.25 |
| | | 300.00 |
| | Total | $71,702.25 |
| (b) | Anthony Iarussi | $60,000.00 |
| | | 750.00 |
| | | 630.10 |
| | | 300.00 |
| | Total | $61,680.10 |
| (c) | Donald Rottman | $40,000.00 |
| | | 500.00 |
| | | 612.17 |
| | | 300.00 |
| | Total | $41,412.17 |
| (d) | Raymond Riddle | $40,000.00 |
| | | 500.00 |
| | | 610.15 |
| | | 300.00 |
| | Total | $41,410.15 |
| (e) | Lawrence Herock | $40,000.00 |
| | | 500.00 |
| | | 615.25 |
| | | 300.00 |
| | | 300.00 |
| | Total | $41,715.25 |
| (f) | John M. Silvestri | $50,000.00 |
| (g) | Robert O. Lampl | $49,293.76 |
| | Olds payment | 18,000.00 |
| | Kruger payment | 26,650.94 |
| | Morison payment | 5,000.00 |
| | Ashton payment | 20,000.00 |
| | Quaker State Land Company payment | 3,000.00 |
| | Helen Lampl payment | 100.00 |
| | Robert O. Lampl | 7,000.00 |
| | Robert O. Lampl | 2,000.00 |
| | Total | $131,044.70 |

2. Thus far, the Court finds the accounting reports submitted incomplete. IT IS THEREFORE FURTHER ORDERED that the above fiduciaries are directed to account more completely with seven sepa-

rate individual accounting reports signed individually providing an explanation for each expenditure shown on the October 28 Lampl Accounting Report, the December 20 Lampl/McMahon Accounting Report and the October 20 Silvestri Accounting Report with the following minimum information: Their individual role concerning the expenditure. They are directed to report who requested the service to be performed, what the purpose was for the service, how the contractor was selected, whether an invoice was submitted for payment, whether they personally saw and reviewed the invoice, who recommended or directed the payment to be made. When a study or report was purchased, a copy of the report is to be submitted. This accounting is to be submitted by July 10, 1986.

A hearing is scheduled for July 22, 1986 at 10:30 A.M. in Room 1603 Federal Building, 1000 Liberty Avenue, Pittsburgh, Pennsylvania at which time compliance with the accounting orders will be considered. The Respondents Robert O. Lampl, John M. Silvestri, Patrick J. McMahon, Anthony Iarussi, Lawrence Herock, Raymond Riddle and Donald Rottman are hereby ORDERED to be present at said hearing.

## SUPPLEMENTAL MEMORANDUM OPINION

### PETITION FOR ACCOUNTING

We commence this Memorandum Opinion by incorporating the Memorandum Opinion and Order of June 30, 1986. The June 30, 1986 Opinion and Order found the Respondents to be fiduciaries and ordered them to repay to the Clerk monies that they had admittedly paid to themselves or to parties over which they had a control or an insider relationship. Further, the June 30, 1986 Order found the accountings of record to be inadequate and ordered the fiduciaries to account further.

In response to the June 30, 1986 Order, John M. Silvestri filed several motions, including a Motion to Extend the Time for Appeal. The Court extended the time for appeal to July 24, 1986. The Court has now extended that time to July 30, 1986.

In the June 30, 1986 Order, the Court set a further hearing for July 22, 1986 to review the matter. At that hearing, the Court reviewed the status of the dispute and reported briefly on the money received and the additional accounting. In response to a Motion for New Trial, etc., the Court offered the Respondents an opportunity to provide additional evidence or witnesses in support of their accountings and briefs of their position. The Court again orally offered the opportunity at the hearing. The Respondents requested that affidavits, reports and applications filed be fully considered by the Court and did not request an opportunity to present other evidence.

John M. Silvestri objected to the Court considering the Report of the United Steelworkers. The Court regards the United Steelworkers' Report to be their effort to reconstruct the facts related to these matters with some particularity as a proposed findings of fact in support of their motion to return the money. For purposes of this Memorandum Opinion and Order, the Court has relied upon as evidence the actual accountings by the fiduciaries. The Court also took judicial notice of the facts available in the official records of the Court. The Court has regarded the fiduciaries as having an affirmative duty to account in detail. The Report of the Steelworkers was not used as evidence.

The Court and the parties are concerned that an appeal of these various orders not be piecemeal or out of time. In order to permit an appeal of all the orders regarding the accounting, the Court reconsiders its June 30, 1986 Order and vacates those parts which are inconsistent with this Memorandum Opinion and Order. For purposes of appeal, the Court intends this Memorandum Opinion and Order to be final.

First we address a legal argument raised by John M. Silvestri. He argues that the funds transferred to MIHRR that originated as the Forsythe Reversion are not property of the Mesta estate and that these

funds were not intended for distribution to Mesta creditors. The Court rejects this argument. The Forsythe Reversion funds were property of the estate. The Forsythe Reversion was intended in part to purchase $906,000 of preferred stock of the MIHRR Corporation. If these funds were not used for the purchase of preferred stock in MIHRR, the funds were to be distributed to the Pension Benefit Guaranty Corporation, a creditor of Mesta.

The October 10, 1984 Order relieved Mesta of its obligation to purchase $906,000 of preferred stock in MIHRR, in return for the transfer of $200,000. It is true that without the October 10, 1984 Order, this $200,000 would have gone to the Pension Benefit Guaranty Corporation and not to the hourly employees class.

Having obtained this $200,000 from Mesta, without having purchased the West Homestead plant, which was a significant change in the Plan, presumably for the benefit of the hourly workers class, it requires an amazing amount of "chutzpah" to now argue this $200,000 does not belong to the class on whose behalf it was obtained but is now to be used by the professionals personally for their fees. The Pension Benefit Guaranty Corporation and Mesta have knowledge of these proceedings and they have not requested a return of the money.

■ Next we address the additional accounting ordered on June 30, 1986. Fiduciaries are expected to keep records in a detailed and thorough manner. It may be that the material submitted is the best effort these parties can produce. No minute books or financial ledgers or stock certificates have been presented to support the accounting. No bank accounts are submitted—except Robert O. Lampl's all-purpose Client Trust Account, and no clear pattern of invoices received, contracts signed, etc. For example, the final payment of $35,000 to Patrick McMahon remains undocumented. No explanation is provided.

There is no excuse for this poor accounting and recordkeeping. But in order to conclude this matter, the accountings are received as the best information available.

The Respondents have not offered any explanation in these accountings of their plan or efforts to continue with the ESOP–MIHRR, even on a reduced scale after (1) a major lender had declined to participate, (2) Mesta was permitted to reduce its preferred stock purchase from $906,000 to $200,000, (3) the various assignments of approximately $400,000 was returned, and (4) approximately $180,000 of the $450,000 disbursed within 10 days of the October 10, 1984 Order. This· lack of explanation weighs heavily in the Court's conclusion.

The rationale which explains most of these disbursements is that these Respondents regarded the October 10, 1984 distribution to MIHRR to be their personal private property. The June 30, 1986 Memorandum Opinion explains why that is not the applicable law. We do not repeat it here.

The Mesta Plan of Reorganization and related Disclosure Statement provided as follows for the hourly employees' claims in *Article 4.03 Class III Claims:*

> 4.03 Class III Claims. Class III Claims are impaired by the Plan. On the Distribution Date, Mesta shall in satisfaction of such Claims, pay or issue, as the case may be, to the holders of Class III claims each holder's share of:
>
> (a) Two Million Four Hundred Eleven Thousand Four Hundred Eighty-Three Dollars ($2,411,483).
>
> (b) Certificates representing 50,000 shares of New Company Common Stock.

Also, in *Article V Purchase of Hourly Corporation Preferred Stock,* the Plan provided that Mesta would purchase preferred stock of this ESOP–MIHRR provided the following conditions were precedent:

> (a) A written agreement of sale providing for the cash purchase and the sale contemplated to be closed.
>
> (b) A firm loan commitment in an aggregate amount of not less than the cash

purchase price of the West Homestead, Pennsylvania plant.

(c) A report from a reputable consultant in form and substance satisfactory to Mesta that indicates reasonable expectation of profitability and cash flow to meet debts.

(d) Etc.

It is clear that these elementary conditions had to be met before the investment by Mesta of $906,000 in preferred stock was made. There is no indication in the accounting or in the record that these conditions were even close to being met.

Further, a specific Order dated May 9, 1984 decreeing the acceptance of the Plan of Reorganization was developed especially for the Hourly Employees Class and mailed to them. It recites at paragraph 6:

6. MESTA shall pay to an Hourly Employee Trust $500,000 of monies allocated to Hourly Employees as set forth in the Amended Plan of Reorganization, which $500,000 shall either be paid over to MIHRR CORPORATION if such corporation acquires MESTA'S former West Homestead, Pennsylvania plant or redistributed to Hourly Employees pursuant to supplemental Order of Bankruptcy Court if such corporation does not acquire MESTA'S former West Homestead, Pennsylvania plant.

Additionally, the information mailed to the Hourly Employees with a solicitation dated May 1, 1984 was consistent with the above.

All the above records mailed to the class indicate that the Hourly Employees Class had reason to believe that $500,000 of their money was to be used for the purchase of the West Homestead plant or returned to them.

Earlier, an unusual order was requested and entered by the Court on December 14, 1983. That order permitted the estate to advance $20,000 to the Hourly Employee Committee for the purpose of producing appropriate studies and the work needed to determine feasibility of the proposed venture. This expenditure specifically was not to be classified as an administrative expense of the estate. There is no statutory

authority for such an order. On June 21, 1984, the Court authorized a supplemental distribution of $20,000 to the Hourly Employees Committee ("HEC") for the same purpose. In the motion requesting the second $20,000, the HEC repeated their need for monies for consultants and for feasibility studies.

We have reviewed the accounting in the light of the above orders and requests for expenses for compensation and fees. The following studies and expenditures appear to be within the guidelines of those Orders:

| $ 6,151.17 | Technical Marketing | 4/19/84 |
| 702.00 | John Bieghle | 4/19/84 |
| 5,000.00 | Alfred Palaez | 7/3/84 |
| 13,122.91 | JACA Corporation | 10/22/84 |
| 124.53 | Tri-State Blue Printer | 10/22/84 |
| 10,694.00 | Keystone Appraisal | 10/22/84 |
| 7,113.86 | Gateway Engineers | 10/22/84 |
| $42,908.47 | TOTAL | |

Under the most favorable circumstances, the development of an ESOP would be fraught with problems. To attempt to do so as part of an hourly class dividend is an even more difficult task. The committee members and their attorneys have not demonstrated any of the special talents or expertise required to accomplish this task. To continue this enterprise without the help of outstanding reputable consultants and the support of bankers was at best not prudent, if not reckless. The above studies only scratched the surface of the information needed to positively influence banks, government units, etc. who would be needed to help create this MIHRR–ESOP. We have read these studies. They are preliminary in nature. They are not adequate to convince prudent investors to participate. However, we believe these kinds of studies were comprehended in the request for the two $20,000 advances. We believe the accounting is adequate to allow these payments. The above payments are allowed.

■ It appears that some of these monies advanced were used as a petty cash fund for the minor expenses of committee members and lawyers. Court orders did not provide for such expenses. These expenses have not been properly explained or

accounted. Statutorily, the Bankruptcy Code makes no provision for expenses of committee members. We choose to follow the reasoning of the Court of Appeals for the Seventh Circuit which finds no statutory authority for the payment of these expenses from the estate. *In the Matter of UNR Industries*, 736 F.2d 1136 (7th Cir.1984).

The committee members now seek approval of payment to themselves for various expenses. These expenditures are not allowed.

 The committee members also seek approval of compensation to themselves for the time spent from almost the commencement of the case for their activities to further the development of the ESOP. Compensation of committee members is not allowed.

(1) Under these circumstances, there is no statutory authority to pay compensation to committee members. See *In the Matter of UNR Industries, supra.*

(2) The committee, in their accountings, admit they undertook these tasks as volunteers.

(3) As fiduciaries, it was not prudent to hire themselves to undertake these tasks, because they possessed none of the specialized skills or talents needed to form such an ESOP.

 The attorneys request that the time they spent attempting to develop this ESOP–MIHRR be compensated in the manner as professionals are compensated in a normal bankruptcy administration.

In the administration of the Mesta case, these attorneys requested pay for these same services. They recite that Mesta objected to the fees requested which were related to the creation of this ESOP. The case record indicates that they consented to a reduction in their fees. The record also indicates that the other professionals also consented to a modification of their fees. It may be that one of the reasons for the reduction in their requested fees was the inclusion of the ESOP work. It may be that there are other reasons also. For example, two attorneys for a special class often create duplication, etc. The record is not specific. However, they were paid $359,092.30, which is a substantial sum when compared to the pay of other professionals. They were also paid separately and substantially for class actions related to employees' medical insurance. There may be other law suits related to this bankruptcy for which they were to be paid.

More importantly, nothing in the record indicates that the hourly class intended their dividend money of $500,000 was to be used for these kinds of attorney fees. The advice they gave to the committee related to the distribution of this money was at best clear error and self-serving and is in itself adequate to deny fees. The record indicates that the work they performed related to the development of the ESOP was contingent and voluntary in nature. In order to be hired to perform ESOP work at this rate of pay, they would need to demonstrate expertise, skill and experience in the creation of an ESOP. No such skill or experience was submitted to the Court.

The attorney fee applications contain many time entries for which both attorneys were present and for which both request payment. There is no explanation of the legal work requiring two attorneys to be present. The applications also contain large amounts of time for attendance at meetings, etc., for which no legal skill is described as needed.

For all of these reasons, the applications for attorney fees are denied.

 Mr. Kruger files an accounting and returns the money he received. He requests payment as compensation for his services. The Court did not order Kruger to return the money, and because he did so promptly and voluntarily, he is to be commended. The Court ordered Robert O. Lampl to account for these monies because the Court believes Kruger to be an insider of Robert O. Lampl. Kruger admits no contract was signed for his employment. No agreement existed as to the amount of compensation. The Court believes Kruger

was a volunteer and that his pay was contingent upon its success. Additionally, no evidence is presented to convince the Court that Kruger contained the special skill needed to created this ESOP. Payment to Kruger is not allowed.

 During the early administration of the case, Edward A. Olds was an associate of Robert O. Lampl. The consented order allowing fees of $359,000 to Lampl and Silvestri clearly indicates that Silvestri and Lampl had a duty to pay Olds: "Lampl and Silvestri shall pay Olds such amount as they shall agree in full and complete satisfaction of the application for compensation submitted by Olds." Payment from the class money is not allowed. Either Robert O. Lampl or John M. Silvestri is responsible for this debt.

 James Ashton also files an application to be paid. The Court regarded Ashton as being associated with Robert O. Lampl because their practice is closely conducted and ordered Lampl to account for this payment. No contract of employment was presented as part of the accounting. At the time Ashton was hired, payment of his employment was contingent upon the success of the ESOP enterprise. The monies obtained as advances were not used to pay him. No provision was made to have him hired by the Court during the administration of the case. The litigation conducted had no value to the Mesta estate itself (Mesta sold the property to Park). It would be valuable only if the plant were purchased and the ESOP established. Certainly the hourly class members could not have contemplated that a necessary expense of buying the West Homestead plant was the bringing of an injunction to enforce an oral sales agreement. The necessity to bring this injunction reflects on the prudent judgment exercised by these fiduciaries and their attorneys. As prudent fiduciaries, a written sales agreement should have been obtained without Court action. The Court does not criticize the legal work Ashton performed which obtained as a settlement the option to buy the plant for a few months of 1984. The need

for this action indicates the frailness of the ESOP project and the poor judgment exercised by these fiduciaries. Ashton was a volunteer and his claim was contingent. Payment is the responsibility of the fiduciaries.

Janice L. Morison also presents a fee petition for her professional services. The Court in the June 30, 1986 Order included the payment to Morison as a responsibility of Robert O. Lampl. The Court believes she was an associate or employee of Robert O. Lampl. Her services were largely related to the Park litigation. Lampl, Silvestri and Ashton also request payment for many of these same activities. If these services were legal in nature, there was great duplication. For the same reasons stated above as to the Lampl, Silvestri and Ashton fee petitions, this application is not allowed.

 There are abundant reasons for denying these applications and petitions for fees and compensation. The Court has denied them on the merits and in detail. However, there is also an overall policy reason. The amount paid to themselves amounts to 89% of the $490,000 and was excessive under any standard. The manner in which these funds were distributed deliberately avoided notice to the interested class. These fiduciaries resisted the accounting ordered. Even if otherwise merited, it would be poor public policy to now regard these actions as a minor omission and to authorize payment.

They commenced this enterprise as volunteers. Although referred to as an ESOP, it is doubtful whether by June–October, 1984 this enterprise could qualify as an ESOP for securities law exceptions. Under these circumstances, formation of a new enterprise requires a security registration. The expenses of formation must be advanced by the organizers. These advances may be repaid when a prospectus is issued and a solicitation attempted. No prospectus or solicitation exists. The Hourly Employees Class cannot be made to bear involuntarily these imprudent burdens.

The money repaid to the Clerk pursuant to the June 30, 1986 Order is reported below:

| Court Ordered Repayment | | Paid on July 10, 1986 |
|---|---|---|
| 1. Patrick McMahon | $ 71,702.25 | $ 35,000.00 |
| 2. Anthony Iarussi | 61,680.10 | 38,000.00 |
| 3. Lawrence Herock | 41,412.17 | 15,000.00 |
| 4. Raymond Riddle | 41,410.15 | 11,497.49 |
| 5. Donald Rottman | 41,412.17 | 20,393.00 |
| 6. John Silvestri | 50,000.00 | 50,000.00 |
| 7. Robert O. Lampl | 131,044.70 | 25,000.00 |
| (Frederick Kruger) | | 26,650.94 |
| TOTAL | $438,661.54 | $221,541.43 |

This Court allows $42,908.47 as expenses. A total of $447,091.53 is to be returned to the Court. (This is $8,429.99 more than ordered on June 30, 1986.) Pursuant to the June 30, 1986 Order, $221,541.43 has been returned. An additional $225,550.10 is to be returned.

The members of the Hourly Employees Committee and counsel to that committee, respondents in this accounting, are fiduciaries to their class, as the Court held in its June 30, 1986 Opinion. The respondents acted together without consent of their class and without order of Court in compensating themselves with funds to be redistributed to their class if the West Homestead plant were not purchased and the ESOP failed.

Where fiduciaries act together in a breach of their trust, they are jointly and severally liable to the beneficiary. The Supreme Court and the Court of Appeals for the Third Circuit have restated this general principle of trust law which also applies to the fiduciaries in a bankruptcy case. *Jackson v. Smith,* 254 U.S. 586, 589, 41 S.Ct. 200, 201, 65 L.Ed. 418 (1921); *McCandless v. Furlaud,* 296 U.S. 140, 165, 56 S.Ct. 41, 49, 80 L.Ed. 121 (1935); See Restatement (2d) of Trusts § 224(2) (1959); A. Scott, Law of Trusts § 224.6 at 1792 (3d ed. 1967); G. Bogert, The Law of Trusts and Trustees § 862 at 35–36 (2d rev. ed. 1982). In *Struble v. New Jersey Brewery Employees' Welfare Trust Fund,* 732 F.2d 325 (3d Cir.1984), the Court of Appeals for the Third Circuit stated: "It is a well-established principle of trust law that multiple trustees who are at fault may be held jointly and severally liable." *Id.* at 332. In *Struble,* under the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub.L. 93–406, 88 Stat. 832 (codified as amended in scattered sections of 26 and 29 U.S.C.), trustees must act for the exclusive purpose of providing benefits to participants and their beneficiaries of the pension plan. 29 U.S.C. § 1104(a)(1). In a Chapter 11 reorganization, members of a creditors' committee and its counsel, as fiduciaries, must similarly act exclusively in the interest of those creditors they represent under the Bankruptcy Code. 11 U.S.C. §§ 1103(b), 1103(c)(5). The Respondents as fiduciaries are jointly and severally liable to repay a total of $447,091.53 into Court.

If the Respondents in this accounting can agree as to their individual liability, upon their application, the Court will mold an appropriate order. The liability to return the entire sum remains joint and several. See Restatement (2d) of Trusts § 258 (1959).

An appropriate Order will issue.

## ORDER OF COURT

AND NOW, this 24th day of July, 1986, upon the basis of the Memorandum Opinion of even date herewith, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

1. Feasibility studies in the amount of $42,908.47, which the Respondents have already paid, are allowed from the $490,000 which the Respondents received from the Mesta estate on behalf of the Hourly Employees Class.

2. The fiduciaries of the Hourly Employees Class, Respondents Robert O. Lampl, John M. Silvestri, Patrick J. McMahon, Anthony Iarussi, Lawrence Herock, Raymond Riddle and Donald Rottman are jointly and severally liable to repay a total of $447,091.53 to the Clerk of the Bankruptcy Court. This amount is reduced by $221,541.43, which the Respondents have already paid to the Clerk on July 10, 1986. The Respondents shall repay the balance of

$225,550.10 to the Clerk of the Bankruptcy Court on or before August 4, 1986.