**In re J.F.D. ENTERPRISES, INC., Debtor.**

**Joseph F. DiSTEFANO and Patricia A. DiStefano, Plaintiffs,**

**v.**

**Peter M. STERN, Eugene B. Berman, Park West Bank and Trust Co., Roger Dialessi, and James H. Fierberg, Defendants.**

**Bankruptcy No. 93–41606–HJB. Adversary No. 97–4114.**

United States Bankruptcy Court, D. Massachusetts.

Aug. 6, 1998.

---

F. Michael Joseph, Springfield, MA, for DiStefanos.

Stephen M. Coyle, for Roger Dialessi.

Kerry David Strayer, Springfield, MA, for Eugene Berman.

Kevin Giordano, for Peter Stern.

## MEMORANDUM OF DECISION

HENRY J. BOROFF, Bankruptcy Judge.

Before the Court for determination are Motions for Summary Judgment (the "Motions") filed by all three of the defendants remaining in this adversary proceeding, Peter M. Stern ("Stern"), Eugene B. Berman ("Berman"), and Roger Dialessi ("Dialessi") (collectively, the "Defendants").[1] In their complaint, Joseph F. DiStefano ("Mr. DiStefano"), a shareholder and unsecured creditor of J.F.D. Enterprises, Inc. ("JFD" or the "Debtor"), and his wife Patricia A. DiStefano ("Mrs. DiStefano"), an under-secured creditor of the Debtor, (jointly the "DiStefanos"), seek damages relative to the business failure and liquidation of the Debtor. They point the finger of blame for their losses at the three Defendants.

### I. *Background*

### A. **Bankruptcy Proceedings and Postpetition Operations**

Prior to the commencement of the case, the Debtor owned all the assets of Century Liquor Mart, a liquor store in West Springfield, Massachusetts. The business was managed by Mr. DiStefano. According to the DiStefanos, business had been good for a number of years, but financial difficulties began to intrude in 1990. The DiStefanos at-

tribute the Debtor's prepetition financial problems to the closure of a nearby bridge and the concomitant reduction in traffic to the shopping plaza where the Debtor's business was located. JFD's financial statements from 1990 through 1993 reflect severe financial distress during that period.[2]

On June 10, 1993, JFD filed a Chapter 11 petition in this Court. An Official Unsecured Creditors' Committee (the "Committee") was appointed shortly thereafter, and, on August 9, 1993, the Court[3] allowed the Committee's application to employ Kamberg, Berman, P.C. as its counsel. Berman is a principal of that firm.

On July 16, 1993, Mrs. DiStefano filed a "Motion ... for Adequate Protection," alleging, inter alia, that she had loaned a total of $477,602 to the Debtor, and that the debt was secured by a junior lien on all of the assets of the company. The Committee filed an objection to allowance of the motion, and a hearing was held on September 9, 1993. Relying on the parties' representation that the matter had been resolved and that a stipulation would be forthcoming, the Court continued the hearing generally. That stipulation (the "Adequate Protection Stipulation") was executed on October 27, 1993 by the Debtor, the Committee, and Mrs. DiStefano, and was subsequently approved by the Court on November 17, 1993. Pursuant to the terms thereof, Mrs. DiStefano's claim was fixed in the amount of $40,000, and deemed to be secured by the Debtor's inventory, proceeds, and accounts receivable, but junior to the security interest of Park West. The stipulation further provided:

---

1. At a May 14, 1997 hearing, the DiStefanos assented to a motion to dismiss all claims against James H. Fierberg ("Fierberg"), and that motion was allowed. All claims against Park West Bank and Trust Company ("Park West" or the "Bank") were subsequently dismissed pursuant to a stipulation of dismissal executed by all of the parties.

2. For example, the financial statements show that the value of the Debtor's inventory decreased by $100,881.00 in 1991, while its accounts receivable increased by only $555.00. In 1992, the Debtor's inventory decreased by $164,172.00, while its accounts receivable increased by only $1,159.00. The Debtor's "cash flow

from financing activities" included "officer loans" of $59,547.00 in 1990, $170,650.00 in 1991, and $243,757.00 in 1992. (In other words, the Debtor's principals were using their own funds, in increasing amounts, to stem the company's financial losses.) The Debtor's tax returns show losses of $94,273.00 in 1990, $197,823.00 in 1991, and $111,814 in 1992.

3. The Honorable James F. Queenan, Jr. presided over this case prior to this judge's appointment and subsequent involvement in the case, commencing June 15, 1994.

That except to institute actions to compel the payment of monies due under the terms of this Stipulation, [Mrs.] DISTEFANO shall have no standing to institute by complaint, Motion or otherwise any action in this case or to object to any aspect of the administration of the proceedings or to be heard as a party in interest therein.

By its terms, the stipulation was to be binding on any subsequently appointed fiduciary in the case, and was to survive either conversion or dismissal of the case.

On July 30, 1993, Berman, as counsel to the Committee, Edward V. Sabella ("Sabella"), as counsel to JFD, and Fierberg, as counsel to Park West, executed and submitted a proposed "Stipulated Order for Use of Cash Collateral" (the "First Stipulated Order"). By virtue thereof, the parties agreed that Park West held a valid, perfected, and enforceable security interest in all of the Debtor's personal property, but agreed to disagree on whether the Bank had such a security interest in the Debtor's liquor license. That matter was explicitly left to be determined by the Court. Further, the continued use of cash collateral was "conditioned upon the Debtor maintaining a post-petition inventory having a value of not less tha[n] the value of the inventory at the time of the filing" of the Chapter 11 case. The First Stipulated Order was entered by the Court on August 18, 1993.

Notwithstanding the stipulations between the parties, the Debtor's financial problems continued. On September 24, 1993, the Committee filed a motion to convert the case to Chapter 7. The Committee alleged that the Debtor had lost a total of $475,000 between August 1990 and May 21, 1993 and the Committee "ha[d] concluded that the Debtor [was] poorly managed and in serious financial condition for reason of a lack of proper business and operational controls and bad organization" which "continue[d] to result in substantial losses to the estate above and beyond the losses as recorded."

The Committee's motion to convert triggered a flurry of activity. The first consequence was a deal struck between Sabella, as counsel to the Debtor, and Berman, as counsel to the Committee. Pursuant to that arrangement, the Committee agreed to withdraw its motion to convert and the Debtor agreed that Mr. DiStefano would step down as manager of the liquor store. That job was offered to Dialessi in early October 1993,[4] and he began working at the liquor store on October 4, 1993. This agreement between the Debtor and the Committee was reflected (after the fact) in an October 14, 1993 stipulation (the "Conversion Stipulation"), which provided, inter alia, that Dialessi would be designated as the general manager of the Debtor and would "be granted, without limitation, all powers and authority of the Debtor to act for and on its behalf in the operation of the business of the Debtor–in–Possession and in the Chapter 11 proceedings of the Debtor."

However, on October 13, 1993, one day prior to the filing of the Conversion Stipulation, Park West filed its own motion to convert the case to Chapter 7. The Bank complained that the Committee had unlawfully "undertaken the management and direction of the Debtor and ... ousted the legal management, placing third parties, with no responsibility to or privity with [the Bank] in custody of the affairs of the Debtor." Park West also complained that, according to information provided by the Committee, the Debtor's inventory had shrunk by one-third to one-half since the filing of the case.

Park West then froze the Debtor's bank account, in which $40,000 had been deposited from accounts receivable, and refused to grant Dialessi check-signing authority on that account. On October 27, 1993, the Debtor filed an adversary proceeding against Park West, seeking a preliminary injunction. However, the complaint was dismissed at the

---

4. At the relevant time, Dialessi owned a liquor store which was "a ten-minute walk" from Century Liquor Mart, although it was in a different city (Springfield) and, according to Dialessi, served an entirely different clientele. Dialessi testified that he was first approached about taking over the management of the liquor store in the summer of 1993 by an agent of a liquor distributor who was a member of the Committee. He was then contacted by Berman in early October 1993.

Debtor's request on November 3, 1993, after Park West had relented and allowed Dialessi to access the account.

On October 29, 1993, the United States Trustee (the "UST"), who apparently also had concerns about Dialessi's role in the case, filed an objection to the Conversion Stipulation and a motion for the appointment of a Chapter 11 trustee or conversion of the case to Chapter 7. The UST complained that Dialessi was unlawfully acting as a de facto Chapter 11 trustee.

At a November 10, 1993 hearing on Park West's Motion to Convert, two more stipulations were submitted in the hope of resolving the outstanding disputes. First, the Debtor, the Committee, Park West, and the UST submitted a "Stipulation and Agreement Concerning Appointment of Chapter 11 Trustee" (the "Trustee Stipulation"). In that document, all parties agreed that the UST would appoint a Chapter 11 trustee. Further, the Debtor, the Committee, and Park West (but not the UST) agreed that Dialessi would "be appointed as the Trustee upon his compliance with and satisfying the standard qualification requirements established by the Office of the United States Trustee."

Second, the Debtor, the Committee, and Park West submitted a "Stipulated Order for Continued Use of Cash Collateral" (the "Second Stipulated Order"). The Debtor and the Committee (reversing its position in the First Stipulated Order) agreed that, inter alia, Park West held a valid, perfected and enforceable prepetition first security interest in and to the Debtor's liquor license, and that the Bank held the same interest postpetition. Park West agreed not to seek relief from the automatic stay or move to convert so long as

certain conditions were met, including: (1) regular monthly payments of principal and interest to the Bank; (2) weekly financial reports to the Committee and Park West; and (3) maintenance of "an aggregate inventory at cost and/or cash and/or accounts receivable in an amount of not less than ONE HUNDRED FIFTY THOUSAND ... DOLLARS." The Second Stipulated Order also provided that Park West's motion to convert was to be deemed withdrawn. At the conclusion of the hearing, the Court executed the Second Stipulated Order, approved the Conversion Stipulation, and approved the Trustee Stipulation.

The UST subsequently decided against appointing Dialessi as the Chapter 11 trustee, and instead named Stern to that post. The appointment was approved by the Court on December 10, 1993. Despite Stern's appointment as trustee, Dialessi stayed on as store manager and ran the day-to-day affairs of the Debtor.

Given the nature of this adversary proceeding, several actions taken by Dialessi as manager of the liquor store are worth mentioning. First, soon after commencement of his duties, Dialessi commissioned RGIS Inventory Service, Inc. ("RGIS") to evaluate the Debtor's inventory levels. RGIS valued the Debtor's inventory at $238,000 at cost, according to Dialessi.[5] However, Dialessi testified that he thought that figure was too high, and asked RGIS to reevaluate the inventory. RGIS conducted a second inventory examination two days later, and arrived at a valuation of $208,000.[6]

Second, approximately a month after commencing his employment, Dialessi discontinued the use of a computerized cash register

---

**5.** Two depositions of Dialessi are included in the exhibits attached to the parties' pleadings, the first in connection with an earlier case between Park West Bank and JFD's shareholders, including Mr. DiStefano, and the second relating to the instant matter. Dialessi first testified that RGIS valued the inventory at $275,000, but changed this answer to $238,000 at the second deposition based on a review of contemporaneous documents. Further, he testified that the inventory was calculated by adding up the shelf price of all inventory, and then extracting from that number the markup utilized by the store, so that the ultimate figure was a cost valuation.

**6.** The deposition testimony of the Debtor's accountant conflicts with Dialessi's. He reported that the first inventory came up with a total of $264,443.85, while the second was $238,899.71. Copies of the RGIS inventories are not attached to any of the parties' pleadings, so the Court cannot determine which numbers are accurate. Nevertheless, both sets of numbers reflect that the first inventory valuation was approximately $30,000 higher than the second one.

system that was intended to monitor the Debtor's inventory levels. At deposition, he testified that he discontinued the system because beer and liquor purchases had not been recorded in the computer during Mr. DiStefano's tenure as manager, and thus the inventory reports produced by the system were inaccurate.

Third, on November 17 and 18, 1993, Dialessi sold a certain quantity of inventory to Marvin Spence ("Spence"), the owner of a liquor store in Amherst, Massachusetts, for a total of $1,921. The extent of the inventory sale is in dispute. At his deposition, Mr. DiStefano testified that he was informed that "a tremendous amount of wines were sold," and estimated that the value of the sold goods was "somewhere around $25,000." [7] However, at his deposition, Spence testified that he purchased 20 to 25 cases, most of which was "French wine or California Cabernets, generic type." Spence further testified that the purchase price was arrived at by reducing the retail value of the inventory by 30 to 40 percent (which would mean, by this Court's calculation, that the retail value was approximately $3,200). Finally, at his deposition, Dialessi testified that, in his estimation, Spence bought approximately 30 cases of wine "[r]anging in price from $8.00 and upward" which he "would say [was worth] $4,000 or $5,000 at retail." [8]

Fourth, Dialessi did not pay substantial sums due the Internal Revenue Service on account of employee withholding taxes. Dialessi Aff. at 6. He stated in an affidavit that both Stern and Berman were aware of this failure. Id.

Fifth, Dialessi testified that he sometimes drew the employees' paychecks on an account that the Debtor used for lottery purposes. This practice was apparently initiated when Park West froze the Debtor's account and Dialessi was unable to access those funds to pay wages. He testified that the Debtor generated only enough income to pay the absolutely necessary expenses, e.g., the rent, the payment to Park West, and the electric bill. He stated that he spoke to Berman about cash flow and inventory problems right from the very beginning, and was told: "keep the store running, do the best you [can], keep it going because it's going to be sold."

Sixth, according to Dialessi, the company became so strapped for cash in February of 1994 that he began buying inventory with his own funds. He testified that he would later reimburse himself with the proceeds generated from the sales of this inventory.

## B. The Sale of the Debtor's Assets

On May 31, 1994, Stern filed a "Motion to Sell Personal Property Located at Century Liquor Mart ... Free and Clear of Liens and Encumbrances with Liens Attaching to Proceeds" (the "First Motion to Sell"). He requested the Court's permission to accept an offer of $275,000.00 from an unrelated third party to purchase all of the Debtor's assets. Stern noted in his motion that the proceeds were to be turned over to Park West, except that "the Estate [would] receiv[e] the first $20,000.00 of the proceeds of the sale" as a "carve out."

However, the Committee filed a limited objection to the First Motion to Sell. Relying on Mass. Gen. Laws Ann. ch. 138, § 25 (1992),[9] the Committee argued that the sale

---

7. At a subsequent deposition, Mr. DiStefano stated that he was told by two store employees that "all of the lay down wines" were sold in the Spence transaction. When pressed on whether the employees told him a more exact amount, he stated: "Regarding that one transaction, the only figure or quantity I can give you is a mountain. I don't know if it was a big mountain or a small mountain ...." No affidavit by either of those store employees has been offered.

8. In an affidavit dated November 12, 1997, Dialessi averred that Spence "purchased approximately $3,200.00 of wine at retail value at a 30%–40% discount for a total purchase price of approximately $2,000."

9. Mass. Gen. Laws Ann. ch. 138, § 25 (West 1992) was the subject of an earlier decision by this Court in this case. The statute requires liquor wholesalers to notify the Massachusetts Alcoholic Beverage Control Commission (the "ABCC") by certified mail "of the name of any licensee whose indebtedness to the wholesaler exceeds sixty days.... The ABCC is required to post the name and address of the delinquent licensee on a Delinquent List." *Stern v. Commonwealth of Massachusetts Alcohol Beverage Control Comm'n (In re J.F.D. Enterprises, Inc.),* 183 B.R. 342, 344 n. 1 (Bankr.D.Mass.1995). The statute further provides:

of the liquor license by Stern would not remove it from the "delinquency list" created by the Massachusetts statute (the "Delinquency List"). The Committee contended that the Court was without jurisdiction to order a sale of the liquor license free and clear of the Delinquency List. The Committee further objected to the proposed sale on the grounds that it benefitted only Park West and the administrative expense claimants, with no possibility of any payment to unsecured creditors. After some inquiry at a July 13, 1994 hearing, the Court concluded that this *contested* sale would produce little or no benefit for the estate. The Court therefore denied the Trustee authorization to sell on the terms requested.

On August 26, 1994, Stern moved to convert the case to Chapter 7, noting that the store was closed on July 14, 1994, and that there was no reasonable likelihood of rehabilitation for the Debtor. The Court granted the motion on the next day, and the UST subsequently appointed Stern as Chapter 7 trustee.

Approximately one month later, Stern filed a "Motion to Sell Property at Public Auction Free and Clear of Liens and Encumbrances with Liens to Attach to the Proceeds of the Sale" (the "Second Motion to Sell"). This time, the Trustee refused to acknowledge the Bank's entitlement to the proceeds. At a hearing held on October 19, 1994, the Trustee argued that the Bank's first security interest in the license was subject to the Delinquency List, and contended that if the rights created by the Delinquency List could be avoided by the Trustee, they could be preserved for the benefit of the estate.

The Committee filed a response to the Second Motion to Sell, again raising the argument that the Court could not authorize a sale free and clear of the Delinquency List. However, as argued by the UST, the situation had now changed. First, the Committee had effectively dissolved upon the conversion of the case to Chapter 7, and second, the aforesaid threatened avoidance action by the Trustee held out the possibility of a dividend for unsecured creditors. Therefore, the Court struck the Committee's objection and granted the Second Motion to Sell, noting that the "[a]lleged lien of Park West Bank and Trust Company [was] to attach to the sale proceeds." On November 29, 1994, Stern moved to confirm the sale of the Debtor's liquor license for $100,000, the amount of the highest bid at the public auction. The motion was granted by the Court on December 20, 1994.[10]

Thereafter, the ABCC refused to remove the Debtor's now-transferred liquor license from the Delinquency List. This dispute culminated in this Court's decision ordering that removal. *See In re J.F.D. Enterprises, Inc.*, 183 B.R. 342 (Bankr.D.Mass.1995). For the reasons stated therein, the Court granted the license buyer's motion to enter an order compelling the ABCC to approve the transfer of the license without substituting the buyer's name for the Debtor's on the Delinquency List. *See id.* Ultimately, Park West received the proceeds of the sale less a negotiated reduction of $25,000. Since the Bank was owed well over $300,000 at that time, it was left with a substantial deficiency.

### C. The Instant Adversary Proceeding

On February 14, 1997, the Plaintiffs filed the instant suit against the Defendants, Park West, and Fierberg in the Massachusetts Superior Court Department of the Trial Court, Hampden Division, and demanded a jury trial. In its complaint, the Plaintiffs seek damages from each defendant in connection with (1) Mr. DiStefano's alleged loss arising from his guarantee of the Debtor's obligations to Park West,[11] (2) Mr. Di-

---

[N]o licensee who is posted on the delinquency list shall purchase or accept delivery of any alcoholic beverage *except for payment in cash on or before delivery.* Whenever the license of any licensee whose name appears on the delinquent list is transferred, the name of the transferee shall appear in the place and stead of the transferor, in the same manner as if no transfer occurred . . . .

Mass. Gen. Laws ch. 138, § 25 (emphasis added).

**10.** It was revealed in subsequently filed pleadings that the balance of the Debtor's personal property was sold for $31,409.70.

**11.** Mr. DiStefano testified at deposition that he had paid Park West the sum of $50,000 in settlement of its claims on the guarantee.

Stefano's alleged loss of his equity in the business, and (3) the non-payment of Mrs. DiStefano's secured claim against the Debtor.[12]

Count one of the complaint alleges that "Stern was negligent and/or willfully failed to properly perform his duties in running the business of [JFD]" and "wrongfully mismanaged the assets and business of [JFD] and breached his fiduciary duties to" the Plaintiffs. The Plaintiffs alleged that Stern's actions caused JFD's assets to become "wrongfully and almost completely depleted ... such that they [were] insufficient to pay the debt of [JFD] to Park West Bank which [was] personally guaranteed by [Mr.] DiStephano [sic], and as a stockholder of [JFD], he [ ] lost the value of the business." The same acts and breach of fiduciary duty by Stern were alleged to have resulted in non-payment of JFD's debt to Mrs. DiStefano. *Id.*[13]

Count two of the complaint is brought against Berman, and alleges that he "assumed the responsibility and performed the duties of collecting, preserving, managing, and administering the assets of the business of [JFD]" and that he "negligently and/or willfully" failed to perform those duties. It is alleged that Berman's conduct caused Mr. DiStefano to be liable under his guarantee of the Park West obligation and to lose the value of the business, and also led to the non-payment of Mrs. DiStefano's claim.

Count three of the complaint is also brought against Berman, and recounts the agreements that the various parties entered into in October and November 1993. Specifically, the complaint refers to the Second Stipulated Order wherein the Debtor, the Committee, and Park West agreed that (1) the Bank's prepetition first security interest in the liquor license was valid, perfected and enforceable, (2) the Bank would receive

monthly loan payments and (3) the Debtor would be managed in such a fashion that its inventory would not be depleted below a level sufficient to pay the debt to the Bank. The DiStefanos then allege:

> 37. Berman breached this agreement by challenging the validity of Park West Bank's prepetition perfected and enforceable security interest in the liquor license and by allowing the wrongful depletion of [JFD's] assets to a level which was insufficient to pay the Park West Bank debt.
>
> 38. As a result of Berman's breach of this agreement, a sale of the license and assets of the going business of [JFD] fell through which sale would have been sufficient to pay the Park West Bank debt in full.

In Count four, the DiStefanos allege that Dialessi had a fiduciary duty to each of them "as stockholders of [JFD]." They also state that "Dialessi had a statutory duty to collect, preserve, manage, hold and administer the assets and the business of [JFD]"; that he "was negligent and/or willfully failed to properly perform" those duties; and that he "wrongfully mismanaged the assets and business of [JFD] and breached his fiduciary duties to" the DiStefanos.

On March 11, 1997, Berman removed the action to this Court, pursuant to 28 U.S.C. § 1452(a) and Federal Rule of Bankruptcy Procedure 9027(a). All parties filed timely answers except Berman, who filed a "Motion to Dismiss and Motion for Rule 11 Sanctions." On May 2, 1997, the DiStefanos filed a motion to remand this matter back to the state court, pursuant to § 1452(b) and Fed. R. Bankr.P. 9027(d). At the May 14, 1997 hearings, the Court denied Berman's motion to dismiss and for sanctions, and denied the Plaintiffs' motion to remand the matter, ruling that the counts detailed above were all

---

**12.** In addition, the complaint raised claims for "extreme and severe emotional distress" suffered by the Plaintiffs as a result of each Defendant's actions. Compl. at 3. However, at the May 14, 1997 pre-trial hearing, the Court, expressing jurisdictional concerns, severed and suspended these claims, pending disposition of the underlying issues.

**13.** The complaint also alleged that Mrs. DiStefano was a stockholder, although the Di-

Stefanos seem to have dropped that contention. *See* Pls.' Resp. to Def. Dialessi's Mot. Summ. J. at 4 (stating that Mr. DiStefano was a shareholder of JFD but referring to Mrs. DiStefano only as "a secured creditor of the Debtor."). The list of the Debtor's shareholders contained in the "Minutes of Special Meeting of Shareholders and Directors of [JFD]" attached to the bankruptcy petition does not include Mrs. DiStefano.

core matters. Berman then filed an answer substantively denying the allegations made against him.

All parties subsequently engaged in extensive discovery, and the Defendants filed the motions for summary judgment and motions to strike jury demands now before the Court. Collectively, the Defendants present four reasons why the Court should grant their motions for summary judgment (although each reason is not necessarily raised by each Defendant). They argue that (1) the DiStefanos lack standing; (2) the statute of limitations has run;[14] (3) the Defendants are entitled to qualified immunity; and (4) the DiStefanos have not shown that any of the Defendants' alleged acts caused the economic harms they have suffered.[15]

After a hearing on the Motions and subsequent briefing, the Court took these matters under advisement.

## II. Analysis

In order for the DiStefanos to prevail, they must demonstrate, as to each defendant, their standing, a duty owed to them, a breach of that duty and damage. Each element must be separately analyzed, employing the summary judgment standards set forth below.

## A. Summary Judgment Standards

Federal Rule of Civil Procedure 56, made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7056, provides that a motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

**14.** Berman and Dialessi raise the statute of limitations defense. They appear to agree with the DiStefanos that the applicable limitations period is three years, as prescribed by the Massachusetts statute regarding tort actions, *see* Mass. Gen. Laws Ann. ch. 260, § 2A (West 1992), and that the "discovery rule" must be applied in determining when the causes of action accrued. The discovery rule provides that "a claim for relief does not accrue until the plaintiff discovers, or with due diligence should have discovered, 'the injury that is the basis of the action.'" *Connors v. Hallmark & Son Coal Company*, 935 F.2d 336, 341–42 (D.C.Cir.1991) (quoting *Northern Cal. Retail Clerks Unions & Food Employers Joint Pension Trust Fund v. Jumbo Markets, Inc.*, 906 F.2d 1371, 1372 (9th Cir.1990)).

Applying the discovery rule to the facts at hand is quite difficult, because the alleged "injury" here did not occur at one discrete time capable of being pinpointed. The DiStefanos are really targeting a pattern of activity by the Defendants which allegedly caused the failure of the business and the concomitant economic harm to them. It seems to the Court that it may be appropriate to apply another statute of limitations accrual rule, known as the "continuing tort" or "continuing violation" doctrine. The continuing violation doctrine provides that "a cause of action for any of the damages a plaintiff has suffered does not 'accrue' until the defendant's tortious conduct ceases." *White v. Mercury Marine, Div. of Brunswick, Inc.*, 129 F.3d 1428, 1430 (11th Cir.1997). The "plaintiff may recover for all the harm he has suffered, not just that suffered during the limitations period." *Id.* However, the First Circuit has employed the continuing tort doctrine in only two settings, employment discrimination cases, *see, e.g., DeNovellis v. Shalala*, 124 F.3d 298 (1st Cir.1997); *Sabree v. United Brotherhood*

of Carpenters and Joiners Local No. 33, 921 F.2d 396 (1st Cir.1990), and actions under 42 U.S.C. § 1983, *see Muniz–Cabrero v. Ruiz*, 23 F.3d 607 (1st Cir.1994); *see also Maslauskas v. United States*, 583 F.Supp. 349, 351 (D.Mass.1984) (United States District Court for District of Massachusetts recognized applicability of the continuing tort doctrine in a Federal Tort Claims Act case). The Circuit has not in any manner suggested that this doctrine should be applied in other contexts. In any event, the Court need not dispose of this issue, since the DiStefanos' claims against the Defendants fail even if timely made. *See infra*, part II.

**15.** Berman also argues that Mr. DiStefano's claims are barred by the doctrines of collateral estoppel and res judicata, based on an earlier adversary proceeding between Park West and Berman. However, Berman does not address the doctrine of res judicata beyond a fleeting reference in a section heading of his brief. As to collateral estoppel, the Court has already ruled at the May 14, 1997 hearing on Berman's motion to dismiss that the doctrine is inapplicable. Imposition of collateral estoppel requires, inter alia, that the relevant dispute has been "actually litigated" in a prior proceeding. *See M–R Sullivan Mfg. Co., Inc. v. Sullivan (In re Sullivan)*, 217 B.R. 670, 674 (Bankr.D.Mass.1998). The referenced adversary proceeding between Park West and Berman was not "actually litigated." It was dismissed due to inactivity. *Cf.* Restatement (Second) of Judgments § 27 cmt. e (1982) ("In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated."); 18 *Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure* § 4442 (1981).

is entitled to a judgment as a matter of law." Fed. R. Bankr.P. 7056; Fed.R.Civ.P. 56(c); *DeNovellis v. Shalala*, 124 F.3d 298, 305 (1st Cir.1997). "The moving party bears the burden of showing the 'absence of evidence to support the non-moving party's position.'" *M–R Sullivan Mfg. Co., Inc. v. Sullivan (In re Sullivan)*, 217 B.R. 670, 673 (Bankr. D.Mass.1998) (quoting *Weiss v. Blue Cross Blue Shield*, 206 B.R. 622, 624 (1st Cir. BAP 1997)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Any disputed facts and inferences must be resolved in favor of the party opposing summary judgment. *DeNovellis*, 124 F.3d at 306; *Fleet Nat'l Bank v. H & D Entertainment, Inc.*, 96 F.3d 532, 537 (1st Cir.1996); *Sullivan*, 217 B.R. at 673.

Once the movant's initial burden has been met, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir.1995), *cert. denied*, 516 U.S. 1113, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996). "The test is whether, as to each essential element, there is 'sufficient evidence favoring the nonmoving party for a [finder of fact] to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *DeNovellis*, 124 F.3d at 306 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)).

**B. Standing**

The Defendants argue that (1) Mrs. DiStefano lacks standing because she waived her standing to bring this action in the Adequate Protection Stipulation; (2) each of the DiStefanos lack standing as to all of the Defendants because these claims properly belong to the estate and can only be brought through a proper derivative action; and (3) each of the DiStefanos lack standing as to Dialessi and Berman, because neither Dialessi nor Berman had any duty to the Di-

Stefanos. The Court will address each argument in turn.

1. *Whether Mrs. DiStefano Waived Her Standing to Bring this Action*

■ In the Adequate Protection Stipulation, the parties agreed as follows:

That except to institute actions to compel the payment of monies due under the terms of this Stipulation, [Mrs.] DISTEFANO shall have no standing to institute by complaint, Motion or otherwise any action in this case or to object to any aspect of the administration of the proceedings or to be heard as a party in interest therein.

The Defendants contend that the foregoing language precludes Mrs. DiStefano's participation in this action. In response, the DiStefanos argue that while Mrs. DiStefano's execution of the Adequate Protection Stipulation "may have waived some rights, it certainly does not waive Patricia DiStefano's rights to pursue relief for tortious conduct against her or for breaches of duties owed her as alleged herein." They also point out that, in any event, this action was originally brought in state court, and, therefore, Mrs. DiStefano did not violate the literal terms of the stipulation.

■ The Defendants cite a Massachusetts Supreme Judicial Court case for the proposition that waivers are generally presumed to be effective in Massachusetts. *See Cormier v. Cent. Mass. Chapter of the Nat'l Safety Council*, 416 Mass. 286, 288, 620 N.E.2d 784, 786 (1993). However, the document before the Court is a stipulation submitted in a bankruptcy case. Thus, federal common law, rather than state law, is controlling.

As noted by the U.S. Court of Appeals for the First Circuit, "[a]t common law, a waiver of rights was simply a contract, subject to defenses like duress or mistake." *American Airlines, Inc. v. Cardoza–Rodriguez*, 133 F.3d 111, 120 (1st Cir.1998). "Under [both] state and federal law, the interpretation of an unambiguous contract is a question of law for the court.... Basic contract interpretation mandates that '[w]here the wording of a contract is unambiguous, the contract must be

enforced according to its terms.' " *Ferris v. Marriott Family Restaurants, Inc.,* 878 F.Supp. 273, 275 (D.Mass.1994) (quoting *O'Connell Management Co. v. Carlyle–XIII Managers, Inc.,* 765 F.Supp. 779, 782 (D.Mass.1991)).

Applying these principles, this Court rules that the waiver of rights by Mrs. DiStefano in the Adequate Protection Stipulation is valid and binding. Mrs. DiStefano entered into the agreement voluntarily. The language is clear and unambiguous. Mrs. DiStefano was precluded from "institut[ing] by complaint, Motion or otherwise any action in this case." It is clear by the use of the word "complaint" that the filing of an adversary proceeding in this Court was prohibited. Initiating an action in another court relative to the same subject matter (the administration of this case) should not be permitted to circumvent the language in and undermine the clear intention of the stipulation. And, in any event, the catch-all word "otherwise" encompasses the manner in which this adversary proceeding originated. Accordingly, Mrs. DiStefano has waived her rights to participate in this proceeding.[16]

### 2. *Whether the DiStefanos Can Bring These Actions on Their Own Behalf*

The DiStefanos have brought this action to recover damages on their own behalf. The Defendants argue that if a claim properly lies, it belongs to the company, JFD, and thus could only have been brought through a derivative proceeding.

■ An action seeking damages for harm to a corporation based on the *prepetition* conduct of its directors or managers becomes the property of the estate upon the filing of a bankruptcy petition. *See* 11 U.S.C. § 541(a)(1) (bankruptcy estate includes, inter alia, "all legal or equitable interests of the debtor in property as of the commencement of the case"); *see also In re Educators Group Health Trust,* 25 F.3d 1281, 1283 (5th Cir.1994) (term "all legal or equitable interests" includes causes of action). Any such

action should be pursued by the representative of the estate, i.e., the trustee or, in a Chapter 11 case where a trustee has not been appointed, by the debtor-in-possession. *See* 11 U.S.C. § 323(b) ("The trustee ... has capacity to sue and be sued."); Fed. R. Bankr.P. 6009 ("With or without court approval, the trustee or debtor in possession may prosecute or may enter an appearance and defend any pending action .... by or against the debtor, or commence and prosecute any action ... in behalf of the estate ....."); *Regan v. Vinick & Young (In re Rare Coin Galleries of America, Inc.),* 862 F.2d 896, 901 (1st Cir.1988) ("The trustee steps into the shoes of the debtor for the purposes of asserting or maintaining the debtor's causes of action, which become property of the estate.").

■ As for a claim for harm done on account of *postpetition* events, the First Circuit established the following test in *Lopez–Stubbe v. Rodriguez–Estrada (In re San Juan Hotel Corp.),* 847 F.2d 931 (1st Cir. 1988), a case in which claims were made against a trustee for his postpetition acts:

> Where the assets of the estate have been diminished by the trustee's actions, the representative of the estate is the proper party to assert claims against the trustee. Conversely, where the actions of the trustee have directly harmed a creditor, it should be the creditor, not the estate that sues.... Were we to rule otherwise, trustees would be subject to inconsistent and multiple liability for their actions in suits by the estate *and* by the creditors.

847 F.2d at 938 (citation omitted). In other words, "[i]f a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action." *St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.,* 884 F.2d 688, 701 (2d Cir. 1989); *see also. Bay Area Material Handling, Inc. v. Broach (In re Bay Area Mate-*

---

16. The same result would be reached if the Court were to apply Massachusetts law. *See Cormier,* 416 Mass. at 288, 620 N.E.2d at 786 (while "doubts about the interpretation of [a] release must be resolved in the [releasing party's] favor," an "unambiguous and comprehensive" release or waiver will be enforced according to its terms).

*rial Handling, Inc.)*, 1995 WL 747954, at *6 (N.D.Cal. Dec. 6, 1995) ("[T]he trustee has the right to pursue postpetition claims on behalf of the estate, but other persons do not."); *In re Tomaiolo*, 205 B.R. 10, 15–16 (Bankr.D.Mass.1997) (where debtor sued attorneys for failing to oppose a motion to convert in bankruptcy proceeding, lawsuit was deemed property of the estate under § 541(a)(7) since it "concerned estate administration" and because "[a]ny loss to the Debtor was derivative of the estate's loss").

■ Applying the *San Juan Hotel* test to the facts here is a relatively simple matter. The heart of the complaint before the Court is that the "negligence and/or wrongful willful acts" of each Defendant damaged the DiStefanos *because* such acts depleted the estate's assets. *See* Compl. at 3–5. The Plaintiffs do not identify any actions by the Defendants which harmed them personally; the economic harm they have allegedly suffered is derivative of that suffered by the estate. Were the Court to find the Defendants liable, any recovery should flow to the estate, so that creditors could participate in accordance with the priority scheme set forth in the Bankruptcy Code.

■ While courts have allowed individual creditors to pursue claims that belonged to the estate in certain situations, those courts have presumed that any recovery would be distributed through the estate. *See San Juan Hotel Corp.*, 847 F.2d at 935 (United States allowed to pursue claim against original trustee of debtor "on behalf of the estate"); *cf. Barnett v. Stern*, 93 B.R. 962, 972 (N.D.Ill.1988) (two creditors allowed to pursue RICO action against debtor and his son where "any property they recovered would belong to the estate"). Further, such permission should be granted only in rare cases,

such as where the proposed defendant in the action is the trustee, or where the trustee or debtor-in-possession is abusing its discretion in not pursuing a third party. *See generally In re El San Juan Hotel Corp.*, 841 F.2d 6, 9 (1st Cir.1988) (in an earlier opinion in the case, the First Circuit suggested that where trustee committed an abuse of discretion, court had authority "to reassign the power to sue on behalf of the estate"). Finally, the party-in-interest must obtain express bankruptcy court approval before commencing such an action, as was done in *San Juan Hotel. See* 847 F.2d at 935; *see also In re Simon*, 179 B.R. 1, 6–7 (Bankr.D.Mass.1995) (creditor must seek leave of court to object to a proof of claim, and may seek leave only if the trustee refuses to take action).[17]

Here, one of the defendants is the Trustee. But the DiStefanos have never sought court approval to pursue claims on behalf of the estate, nor have they ever indicated an intention to share any recovery with the creditor body. The DiStefanos have, therefore, no standing to sue any of the Defendants to obtain a recovery which, even if appropriate, would belong to the estate.

3. *Whether Berman and Dialessi Were Fiduciaries of the DiStefanos*[18]

Berman and Dialessi argue that even if the DiStefanos had standing to sue the Defendants for their individual losses, Berman and Dialessi are not fiduciaries of either Mr. DiStefano because he is only a shareholder, or Mrs. DiStefano because she is only a secured creditor.

■ "The question of whether a fiduciary relationship exists is generally determined as a question of fact." *Fleet Nat'l Bank v. H & D Entertainment, Inc.*, 926 F.Supp. 226,

17. Of course, a party who becomes aware of actions by a trustee that lead to a diminishment of estate assets could also move the court for the removal of the trustee pursuant to 11 U.S.C. § 324. The successor trustee could then investigate and pursue an action for damages, if the situation so warranted. *See San Juan Hotel Corp.*, 847 F.2d at 935; *Kates v. Transamerica Ins. Group (In re Prairie Cent. Ry.)*, 209 B.R. 232, 236 (Bankr.N.D.Ill.1997) (Chapter 7 trustee has standing to sue former Chapter 11 trustee for breach of fiduciary duty).

18. Stern does not argue that he was not a fiduciary of the DiStefanos. *See Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 355, 105 S.Ct. 1986, 1994, 85 L.Ed.2d 372 (1985) ("[T]he fiduciary duty of the trustee runs to shareholders as well as to creditors."); *Bay Area Material Handling*, 1995 WL 747954, at *7 ("A trustee owes a fiduciary duty to the debtor's shareholders and to each creditor of the bankrupt estate.").

242 (D.Mass.1996). "[A] fiduciary relationship will be held to exist between two persons 'when one of them is under a duty to act or give advice for the benefit of another upon matters within the scope of the relation.'" *Id.* (quoting *Restatement (Second) Torts* § 874, cmt. a (1979)). The analysis proceeds differently as between Dialessi and Berman.

■ Dialessi was an employee first of JFD, as the debtor-in-possession, and then of Stern once he was appointed. His level of involvement in the Debtor's affairs is fully documented in the record before the Court and is not the subject of dispute. Prior to Stern's appointment, Dialessi possessed, pursuant to the Conversion Stipulation, "without limitation, all powers and authority of the Debtor to act for and on its behalf in the operation of the business of the Debtor–in–Possession and in the Chapter 11 proceedings of the Debtor." After Stern's appointment, Dialessi was still substantially responsible for the day-to-day operations of the Debtor, even accepting the DiStefanos' allegations regarding Berman's exertion of control as true. An estate representative's agent with this level of authority and responsibility must be deemed a fiduciary of the estate and a debtor's shareholders.

■ As for Berman, it is well-established that a "creditors' committee and its members owe no duty to the debtor or to the estate." *In re Microboard Processing, Inc.*, 95 B.R. 283, 285 (Bankr.D.Conn.1989); *see also Official Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.)*, 984 F.2d 1305, 1315 (1st Cir.1993) (the committee "is a fiduciary for those who it represents, not for the debtor or the estate generally"). It follows that *counsel* to a creditors' committee is not a fiduciary of the debtor or of the estate generally, much less of the debtor's principal, even though committee counsel does owe a fiduciary duty to the committee and its members.

■ Some courts have gone a step further and held that counsel to a committee owes a fiduciary duty to "the creditors whom that committee was to represent." *D.H. Overmyer Telecasting Co.*, 47 B.R. at 824; *see also In re Celotex Corp.*, 123 B.R. 917, 920 (Bankr.M.D.Fla.1991); *United Steelworkers of Am. v. Lampl (In re Mesta Machine Co.)*, 67 B.R. 151, 157 (Bankr.W.D.Pa.1986). The issue is important here because, in addition to being a shareholder of the Debtor, Mr. DiStefano *is* also an unsecured creditor of the estate.[19] Nevertheless, this Court believes that characterizing committee counsel as a fiduciary of all unsecured creditors is unwarranted. As stated in a leading bankruptcy treatise:

> The professionals represent the committee itself and not the entire class represented by the committee. Some cases have alluded to the concept that a committee professional has a broader duty than simply a duty to the committee. Such statements are misplaced. The committee itself represents the members of the class and the professionals follow the instructions of the committee. The professionals should not be placed in a position whe[re] they are expected or encouraged to second guess the committee as to how best to further the interests of the committee's constituency.

7 *Collier on Bankruptcy* ¶ 1103.03[7] (15th ed. rev.1996) (footnote omitted). It follows that only the committee itself and (perhaps) individual committee members have standing to sue committee counsel; other parties in the case, even unsecured creditors, do not. This comports with how similar matters are dealt with in a non-bankruptcy context; an

---

19. By virtue of Mr. DiStefano's guaranty of the Debtor's obligation to Park West, he held on the date of case commencement a "contingent, unliquidated right to payment" from the estate—that is, a claim under 11 U.S.C. § 101(5). *See Travelers Ins. Co. v. Cambridge Meridian Group, Inc. (In re Erin Food Services)*, 980 F.2d 792, 796 (1st Cir.1992) (the personal guarantor of the debtor's obligation to secured lenders "held a contingent unsecured claim against" the debtor); *see also Mid–State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1336–37 (7th Cir.1989) ("Guarantors must be treated as creditors."); *Miller v. Boles (In re Boles)*, 150 B.R. 733, 736 (Bankr.W.D.Mo.1993) (guarantor had standing to raise objections and exceptions to discharge because its contingent claim gave it the status of a creditor); *Murphy v. Wainwright Bank & Trust Co. (In re Jameson Travel, Inc.)*, 147 B.R. 822, 823 (Bankr.D.Mass.1992) (guarantor holds a contingent claim against debtor, and is thus a creditor for purposes of 11 U.S.C. § 547(b)).

attorney generally only owes a fiduciary duty to his or her client, and is generally only subject to liability to that party.[20]

Nor is the DiStefanos' position elevated when they argue that they may sue Berman for breach of contract on account of his objection to the sale, the failure to make regular payments to the Bank or the depletion of the Debtor's inventory, all in alleged breach of provisions of the Second Stipulated Order and the Conversion Stipulation. It was the Committee that entered into those stipulations, not Berman in his individual capacity. And, more importantly, the DiStefanos were not parties to either agreement.

A final argument raised by the DiStefanos requires few words. The DiStefanos argue that they have standing to sue the Defendants under the provisions of 28 U.S.C. § 959.[21] That argument is plainly wrong. Nothing in § 959 provides an independent basis for the personal liability of court-appointed functionaries. The statute was promulgated to serve two purposes: (1) to relieve third parties with postpetition claims against an operating estate from the obligation of bringing actions in the appointing forum, and (2) to assure all parties that such an estate was obliged to comply with applicable state and federal laws associated with the operation of the business. There is no evidence that it was ever intended to apply to claims by creditors or shareholders against trustees, receivers, and managers based on alleged losses incurred in the course of estate administration, or that it was intended to expand the personal liability of court-appointed functionaries. Were the statute interpreted otherwise, trustees of failed estates would be subject to multiple and vexatious litigation filed by disappointed creditors and shareholders in state courts. Such litigation would undermine, if not destroy, the bankruptcy court's exclusive and core jurisdiction in bankruptcy cases.

Applying the foregoing analysis, neither of the DiStefanos has standing to sue any of the Defendants.

## C. The Defendants' Standard of Care

Even were the Court to rule that the DiStefanos had standing to prosecute this action, the Defendants argue that they have qualified immunity from tort liability stemming from their actions as officers of the bankruptcy estate. Pursuant to that protection, the Defendants claim to be liable only for "willful and deliberate" acts in violation of their fiduciary duties. They contend that none of their actions meet that high standard. The DiStefanos, on the other hand, contend that the Defendants are liable for their alleged negligent acts. In the alternative, they argue that there is evidence of record establishing that each Defendant willfully violated his fiduciary duty.

This Court has already held, *supra*, that counsel to a creditors' committee is a fiduciary of the committee only. Therefore, the standard of care to which Berman should be held is not relevant here. Dialessi, on the other hand, was a fiduciary of the estate and the Debtor's shareholders, and, as such, would be subject to liability for any willful or negligent acts of harm in breach of his duties to the estate and the shareholders. Far more complicated is the standard of care

---

**20.** The DiStefanos also argue that fiduciary duty is not at issue because they have standing to sue Berman "for negligence ... irrespective of whether a fiduciary relationship exists." However, the tort of negligence also assumes the existence of some duty which has been breached. The DiStefanos have identified none owed to them by Berman.

**21.** 28 U.S.C. § 959 provides:

(a) Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury.

(b) Except as provided in section 1166 of title 11, a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

owed by Stern as trustee, and to that morass the Court now turns.

The issue of the personal liability of bankruptcy trustees arises in two contexts: (a) acts or omissions of the trustee in operating the debtor's business (or managing the debtor's property) which causes injury to the plaintiff(s), and (b) the trustee's violation of his or her fiduciary duties to the estate, the creditors, or the shareholders. *See generally* E. Allan Tiller, *Personal Liability of Trustees and Receivers in Bankruptcy*, 53 Am. Bankr.L.J. 75, 76 (1979) (hereinafter "Tiller"). There is no question but that a trustee, acting within the scope of his or her authority or with the benefit of an authorizing and properly noticed court order, performs his or her duties with the benefit of judicial immunity. *See Mosser v. Darrow*, 341 U.S. 267, 274–75, 71 S.Ct. 680, 683–84, 95 L.Ed. 927 (1951); *San Juan Hotel Corp.*, 847 F.2d at 940 ("But in *Mosser* the Supreme Court ... not[ed] that the way for trustees to avoid uncertainty about personal liability is to seek instruction from the bankruptcy court on difficult questions of judgment and to file periodic accounts with the court."). However, such immunity does not extend to acts which are ultra vires or in breach of a trustee's fiduciary duty.

The Bankruptcy Code is silent with respect to the standard of care due from trustees. *See Hutchinson*, 5 F.3d at 752; *Nat'l Bankr. Review Comm'n, Final Report* § 3.3.2, at 859 (1997). Turning to case law, in *Mosser*, 341 U.S. at 268, 71 S.Ct. at 681, the Supreme Court was presented with the question of whether a receivership trustee (under the Act) should be held liable where the trustee had "permitted key employees to profit from trading in securities of the debtors' subsidiaries." The Court held the trustee personally liable for the damages to the estate resulting from his employees' actions, stating:

> It is argued here, and appears to have been the view of the Court of Appeals, that principles of negligence applied and that a trustee could not be surcharged under many decisions unless guilty of 'supine negligence.' We see no room for the operation of the principles of negligence in a

case [such as this one] in which conduct has been knowingly authorized. This is not the case of a trustee betrayed by those he had grounds to believe were trustworthy, for these employees did exactly what it was agreed by the trustee that they should do. The question whether he was negligent in not making detailed inquiries into their operations is unimportant, because he had given a blanket authority for the operations. The liability here is not created by a failure to detect defalcations, in which case negligence might be required to surcharge the trustee, but is a case of a willful and deliberate setting up of an interest in employees adverse to that of the trust.

. . . .

.... Trustees are often obliged to make difficult business judgments, and the best that disinterested judgment can accomplish with foresight may be open to serious criticism by obstreperous creditors aided by hindsight. Courts are quite likely to protect trustees against heavy liabilities for disinterested mistakes in business judgment. But a trusteeship is serious business and is not to be undertaken lightly or so discharged. The most effective sanction for good administration is personal liability for the consequences of forbidden acts ....

341 U.S. at 272–74, 71 S.Ct. at 682–83.

*Mosser* makes clear that trustees are personally liable for willful, or intentional, violations of their fiduciary duties. *See San Juan Hotel Corp.*, 847 F.2d at 937 ("Following *Mosser*, federal courts including this one have 'uniformly held that bankruptcy trustees are subject to personal liability for the willful and deliberate violation of their fiduciary duties.'") (quoting *Connecticut Gen. Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612, 621 (1st Cir.1988)); *see also Hall v. Perry (In re Cochise College Park, Inc.)*, 703 F.2d 1339, 1357 (9th Cir.1983); *Ford Motor Credit Co. v. Weaver*, 680 F.2d 451, 461 (6th Cir.1982); *Sherr v. Winkler*, 552 F.2d 1367, 1375 (10th Cir.1977); *In re Markos Gurnee Partnership*, 182 B.R. 211, 219 (Bankr. N.D.Ill.1995). However, the question of whether a less than intentional violation of a

fiduciary duty will subject a trustee to personal liability has divided the Circuits.[22] Interestingly enough, both sides of the debate point to *Mosser* as support for their position.

For instance, in *Sherr*, the U.S. Court of Appeals for the Tenth Circuit interpreted *Mosser* to hold "that a reorganization trustee would not be liable personally except for willful and deliberate acts." 552 F.2d at 1375. The court went on to hold that a trustee "may be held liable *in his official capacity* and thus surcharged if he fails to exercise that degree of care required of an ordinarily prudent person serving in such capacity, taking into account the discretion allowed." *Id.* (emphasis added); *see also In re Chicago Pacific Corporation*, 773 F.2d 909, 915 (7th Cir.1985) (following *Sherr*); *Weaver*, 680 F.2d at 461–62 (following *Sherr*, and holding that principles enunciated therein applied equally well to a debtor-in-possession); *United States v. Sapp*, 641 F.2d 182, 184–85 (4th Cir.1981) (following *Sherr*). Implicit in the Tenth Circuit's reasoning is that the term "surcharged" means the damages resulting from the trustee's negligence would be paid only from the funds in the estate, and not from the trustee's own assets (or, possibly, from those of the trustee's insurance carrier).

In *Cochise College Park, Inc.*, the U.S. Court of Appeals for the Ninth Circuit disagreed with the Tenth Circuit's interpretation, and held that a trustee "is subject to personal liability for not only intentional but also negligent violations of duties imposed upon him by law." 703 F.2d at 1357. The court took issue with the Tenth Circuit's interpretation of the term "surcharge," and stated:

Given that the term "surcharge" itself means to impose "personal liability on a fiduciary for wilful or negligent misconduct in the administration of his fiduciary duties," . . . we find this interpretation to be incorrect. Properly construed, the language quoted from *Mosser* indicates merely that the sort of personal liability which may be imposed on a trustee for the acts of his employees is not strict liability but rather liability depending at least on a showing of the trustee's own negligence; *Mosser* does not "hold" in any sense that personal liability does not obtain if such a showing of negligence is made.

703 F.2d at 1357 n. 26 (quoting *Black's Law Dictionary* 1292 (rev. 5th ed.1979)); *see also In re Rigden*, 795 F.2d 727, 730 (9th Cir. 1986); *In re Gorski*, 766 F.2d 723, 727 (2d Cir.1985); *Red Carpet Corp. of Panama City Beach v. Miller*, 708 F.2d 1576, 1578 (11th Cir.1983); *Barrows v. Bezanson (In re Barrows)*, 171 B.R. 455, 457–59 (Bankr.D.N.H. 1994).

As exemplified in the dispute between the Circuits, exactly how far the holding in *Mosser* can be extended is a difficult question.[23] It appears to this Court that the holding of *Mosser* cannot be extended any further than the proposition that trustees are personally liable for intentional violations of their fiduciary duties. The Supreme Court limited its holding to cases involving intentional breaches of fiduciary duty, and expressly avoided extending its holding any further. *See Carter v. Schott (In re Carter Paper Co.)*, 220 B.R. 276, 296 (Bankr.M.D.La.1998) ("We think that the *Mosser* court made no determination concerning whether run-of-the-mill negligence is sufficient to constitute breach of fiduciary duty sufficient to warrant imposi-

---

**22.** The First Circuit has not addressed this issue.

**23.** This Court's characterization of the state of the law is supported by the recent Final Report of the National Bankruptcy Review Commission. In the section entitled "Personal Liability of Trustees," the Commission stated:

The Bankruptcy Code does not provide a personal liability standard for bankruptcy trustees. Since 1978, the courts that have addressed this issue have come to contrary conclusions. Under what has been described as a "crazy quilt" of decisions, trustees are held to standards of care ranging from personal liability for negli-

gence, to personal liability for willful and intentional acts in violation of the trustee's duties. Some courts also find that trustees have derived judicial immunity for acts taken within the scope of their authority. The only Supreme Court decision in this area, *Mosser v. Darrow*, held a trustee personally liable for allowing his agents to profit at the estate's expense. Unfortunately, *Mosser* has not provided much guidance to subsequent courts and has been cited for a broad range of positions. *Nat'l Bankr.Review Comm'n, Final Report* § 3.3.2, at 859–60 (1997) (footnotes omitted).

tion of personal liability, as it dispensed with any determination regarding any level of negligence."); *Carlos J. Cuevas, The Myth of Fiduciary Duties in Corporate Reorganization Cases,* 73 Notre Dame L.Rev. 385, 392 (1998) ("The Supreme Court [in *Mosser*] never discussed the issue of what was the standard for imposing liability on a trustee for breach of fiduciary duty.").

■ In its recent Final Report, the National Bankruptcy Review Commission made the following observation regarding the difficulty in choosing the appropriate standard for trustee liability:

> Any attempt to codify a standard for personal trustee liability runs the risk that some measures would provide too little protection and some measures would provide too much protection. Too little protection might expose a trustee to excessive personal liability and dissuade capable people from becoming trustees. Too much protection will not encourage responsible decision making on difficult estate management issues.

*Nat'l Bankr. Rev. Comm'n, Final Report* § 3.3.2, at 860–61 (1997) (footnote omitted). This Court agrees. Imposing personal liability on trustees only for intentional harm would be unwarranted. A trusteeship is "serious business," *Mosser,* 341 U.S. at 274, 71 S.Ct. at 683, which demands attention. If trustees were liable only for intentional breaches of their duties, the goal of expeditious and efficient administration of bankruptcy estates would be jeopardized. More must be expected of trustees. But how much more?

■ The courts that have held trustees personally liable for less than intentional breaches of duty are divided between applying a straightforward negligence standard and a somewhat higher standard, sometimes referred to as "gross" or "supine" negligence. Compare *Gorski,* 766 F.2d at 727 (applying regular negligence standard); *Cochise College Park, Inc.,* 703 F.2d at 1357; *In re Curtis,* 76 F.2d 751, 752–53 (2nd Cir.1935); *Quinn v. Fidelity & Deposit Co. (In re Sturm),* 121 B.R. 443, 448 (Bankr.E.D.Pa. 1990) with *Evans v. Williams (In re Hitt Lumber & Box Co.),* 276 F. 650, 655 (6th Cir.1921) (where there was no claim that receiver acted in bad faith, "gross and culpable negligence and misconduct in continuing the operation after he knew or ought to have known that by so doing he was not conserving but dissipating the assets of the bankrupt" must be shown in order for receiver to be liable); *In re Marcus,* 2 F.Supp. 524, 525 (W.D.Pa.1932) ("a receiver is liable to surcharge only when guilty of fraud or supine negligence equivalent to fraud"); *see also* Tiller, 53 Am. Bankr.L.J. at 94 ("Thus, some of the cases . . . suggest that if the trustee or receiver is shown to have acted in good faith, the standard applicable to him will be actually greater than ordinary negligence.").

Although the courts which have considered the issue recently have endorsed the simple negligence standard, they relied on *Mosser* for that holding, improperly so in this Court's view. Further, those courts which apply a simple negligence standard to the acts of a trustee underestimate the role of a trustee under the Bankruptcy Code and the difficulty associated with a trustee's duties. In Chapter 7 cases and in Chapter 11 cases where the debtor has been relieved of possession, trustees take on enormous responsibilities. Yet, trustees are sent into the fray without the most basic of protections, that of sufficient historical knowledge of the debtor's affairs.[24] The requirement of disinterested-

---

**24.** As stated by the National Bankruptcy Review Commission:

> There are a myriad of difficult decisions that may face a trustee trying to administer an estate:
>
> In fact, trustees are commonly faced with decisions to either take action or not, whether it be to file a complaint, a motion to set aside a judgment, or to assume or reject a lease or other contract with virtually no notice. Sometimes trustees have only hours to make such decisions and are faced with the unenviable duty of preserving the status quo under the threat of rule 11 sanctions or being sued personally for failure to preserve and protect an intangible asset of the estate. Other decisions trustees face frequently include the decision whether or not to close a business in Chapter 11 or an operating Chapter 7, whether or not to attempt to sell assets or surrender them to secured creditors, whether to administer or abandon causes of action, and a myriad of other decisions which trustees must make upon con-

ness usually denies the trustee meaningful advance information with respect to the critical issues in the case.

If the debtor is a business, the trustee will usually have little (or no) prior understanding of the industry in which the business operated. If further operation of the debtor's business is required, the trustee will be expected to make decisions presumably sounder than those of the principals who failed in that enterprise. If liquidation is the direction taken, the trustee will be expected to conduct that liquidation in a manner consistent with the industry in which the business operated. And the trustee is to accomplish these tasks without the unconditional confidence or assistance of any other actor in the case, except for that of her or his own agents. The court and the United States Trustee must remain disinterested. The debtor (or its principals, if the debtor is a corporation) certainly has no affection for the trustee. Secured creditors are the trustee's statutory adversaries. And unsecured creditors demand of the trustee the due performance of the trustee's duties, amid their underlying concern that the trustee may object to their claims, demand recovery of their prepetition gains as preferences or fraudulent transfers, and/or question their prepetition business activities with the debtor. Further, they often resent the dilution to their ultimate recovery that is caused by a trustee's involvement and resulting claim for compensation.

The considerations detailed above lead to this Court's firm conclusion that trustees should not be deemed to have violated their fiduciary duty and become subject to personal liability unless they are found to have acted with gross negligence. Gross negligence has been defined as:

> The intentional failure to perform a manifest duty in reckless disregard of the consequences .... It is an act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care. It amounts to indifference to present legal duty and to utter forgetfulness of legal obligations so far as other persons may be affected.

*Black's Law Dictionary* at 1033 (6th ed.1990). This standard of care strikes the proper balance between the difficulties of the task assumed by trustees and the need to protect the interest of creditors and other parties in the bankruptcy case.[25]

flicting, second-hand information being provided by the debtor and creditor groups, as well as professionals upon whom the trustee relies. Despite all this, trustees are expected to make such decisions in a timely manner. A trustee, unlike the debtor who often purchased the assets and created the problems which caused the filing, never holds a "full deck of cards to play."
Nat'l Bankr.Rev. Comm'n, *Final Report* § 3.3.2, at 863 (quoting Mem. from David W. Allard on behalf of the National Association of Bankruptcy Trustees, Bankruptcy Trustees Should be Provided a Uniform Standard of Care Governing Personal Liability—Support for Revision of the United States Bankruptcy Code, at 4–5 (April 1997)).

**25.** The Commission's final recommendation on this issue was as follows:

Trustees appointed in cases under Chapter 7, 11, 12 or 13 of the Bankruptcy Code should not be subject to suit in their individual capacity for acts taken within the scope of their duties as delineated in the Bankruptcy Code or by order of the court as long as the applicable order was issued on notice to interested parties and there was full disclosure to the court. Chapter 7, 12 and 13 trustees only should be subject to suit in the trustee's representative capacity and subject to suit in the trustee's personal capacity only to the extent that the trustee acted with gross negligence in the performance of the trustee's fiduciary duties. Gross negligence should be defined as reckless indifference or deliberate disregard of the trustee's fiduciary duty.
A Chapter 11 trustee for a corporate debtor only should be subject to suit in the trustee's representative capacity and subject to suit in the trustee's personal capacity only to the extent that the trustee has violated the standard of care applicable to officers and directors of a corporation in the state in which the Chapter 11 case is pending.
Debtors in possession should remain subject to suit to the same extent as currently exists under state or federal law.
Nat'l Bankr.Rev. Comm'n, Final Report § 3.3.2 (1997).
This Court sees no reason to distinguish the standard of care to which a Chapter 11 trustee will be held from that applicable to a Chapter 7 trustee. Either may be involved in running a business. Either may be involved in the liquidation of assets. Further, tying the liability of trustees to that of directors and officers under state law leaves trustees too vulnerable to changes under state law. Trustees need the as-

## D. Breach and Causation

■ Even if the DiStefanos had the requisite standing to assert claims for their personal losses or for those of the estate, it is not enough to describe the alleged tortfeasors' standard of care and then point to harm. First, the DiStefanos must demonstrate that the appropriate standard was breached. Second, they must show that the breach proximately caused them or the estate harm. *See Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 513 (S.D.N.Y.1994) ("Delta cannot sustain any of its counterclaims against the Creditors Committee unless it demonstrates *causation in fact* by proving, by a preponderance of the evidence, that (1) the Committee committed a wrong, (2) Delta suffered an injury, and (3) the injury was the 'certain result of the wrong.'") (quoting *Story Parchment Co. v. Paterson Parchment Paper Co. et al.*, 282 U.S. 555, 562–64, 51 S.Ct. 248, 250–51, 75 L.Ed. 544 (1931)); *see also Bear Stearns and Co., Inc. v. Daisy Sys. Corp. (In re Daisy Sys. Corp.)*, 97 F.3d 1171, 1177 (9th Cir.1996) (in order for debtor to recover against investment banker for alleged prepetition harm to debtor's financial position, would "have to demonstrate that Bear Stearns' advice … was a 'substantial factor' in its bankruptcy; in order to do so, it would have to demonstrate that other, perhaps internal, concerns did not lead to its downfall"); *San Juan Hotel Corp.*, 847 F.2d at 938 ("[W]e think that some assessment of harm must be the guiding principle underlying *Mosser* liability."); *In re Tucker Freight Lines, Inc.*, 62 B.R. 213, 218 (Bankr.W.D.Mich.1986) (court addressed defendants' argument that letter sent to unsecured creditors which allegedly caused the rejection of the debtor's plan by that class "could not have caused the plaintiff any harm" because the defendants held enough debt to control the vote). Even though this proceeding is only at the summary judgment stage, there still must be some evidence of causation beyond mere conjecture. *See generally Hartsel v. Keys*, 87 F.3d 795, 803 (6th Cir.1996) ("Usually, the question of causation is a factual issue … [that] may be satisfied by circumstantial evidence…. Nonetheless, a court may grant summary judgment even in a causation inquiry, where it is warranted."); *Lechuga v. Southern Pac. Transp. Co.*, 949 F.2d 790, 798 (5th Cir.1992) ("Conclusory statements in an affidavit do not provide facts that will counter summary judgment evidence, and testimony based on conjecture alone is insufficient to raise an issue to defeat summary judgment."); *see also Vartanian v. Monsanto Co.*, 131 F.3d 264, 266 (1st Cir.1997) ("The nonmovant may not, of course, defeat a motion for summary judgment on conjecture alone.").

The DiStefanos' arguments are essentially that Stern and Dialessi failed to perform their duties and that Berman overstepped his authority in taking control of the Debtor and/or breached an agreement to safeguard the estate's assets and not to challenge the Bank's secured claim. As held in part II.B.3, *supra*, Berman had no duty to the DiStefanos or even for that matter to the estate.[26] But with respect to Stern and Dialessi, it does appear that genuine issues exist as to whether either or both breached their respective duties of care. In their "Statement of Material Facts in Dispute in Re-

surance of a more stable standard to which their actions will be held.

**26.** The argument that Berman personally assumed such duties by virtue of his agreement to the Second Stipulated Order has no merit. As noted above, Berman did not execute any agreement in his individual capacity. His actions were only as an agent of the Committee. Further, the DiStefanos present no evidence on which this Court could reasonably rely to conclude that the Committee's agreement to the Second Stipulated Order constituted its indemnification of the Debtor's future losses. And, finally, even in its objection to the sale motions, the Committee did not breach any agreement to concede the validity, priority and enforceability of the Bank's first security interest in the liquor license. Rather, the Committee argued that the liquor license was subject to regulations by the Commonwealth of Massachusetts and that the regulations could not be avoided by this Court. The priority of the Bank's security interest in the *regulated* liquor license was not challenged. *See* Mem. of Law in Supp. of Committee's Limited Obj. to Trustee's Mot. to Sell at 4 ("M.G.L. c. 138 was enacted pursuant to the police powers of the Commonwealth of Massachusetts and as such it does not create any type of 'lien, encumbrance or interest' on the license, statutory or otherwise.") (filed July 1, 1994).

sponse to Motions for Summary Judgment" filed on December 12, 1997, the DiStefanos point to six disputed facts and argue that, if proven at trial, they would lead to a finding that Stern and Dialessi were liable for a breach of their fiduciary duties. These "facts" are as follows: (1) the Store's customer count declined precipitously soon after Dialessi became manager; (2) Dialessi's failure to use the computerized inventory monitoring system prevented accurate tracking of the Debtor's inventory; (3) although he was authorized by the Conversion Stipulation to receive a salary of $600 per week, Dialessi actually paid himself $750; (4) Dialessi improperly sold "several truckloads of premium wines ... for a nominal sum"; (5) Dialessi failed to pay employee withholding taxes to the Commonwealth of Massachusetts; and (6) Dialessi paid payroll out of the Debtor's lottery ticket sales account.

While there are problems with several of these "facts," it seems to the Court that at least two of them present genuine issues of material fact as to whether Stern and Dialessi breached their respective standards of care. First, the Trustee Stipulation explicitly provided that Dialessi's salary was to be $600 per week, but he testified that he was paid $750 per week at Berman's instruction (although an employee supervised by Dialessi issued the payroll checks). This raises a material fact, i.e., whether Dialessi intentionally paid himself more than he was authorized by the responsible parties and why that was not stopped by Stern. Second, Dialessi's deliberate failure to pay employee withholding taxes is particularly troubling to the Court. *See San Juan Hotel Corp.*, 847 F.2d at 946.

Further, Peter Stocks ("Stocks"), counsel to the United States Trustee, stated in his deposition that although his office was receiving financial reports from Berman (which were apparently prepared by Dialessi and the accountant), the United States Trustee was not receiving the required monthly Operating Guideline and Reporting Requirement financial reports from Stern. He complained about this in letters to Stern dated January 1994 and April 1994. According to Stocks, Stern never rectified this problem.

Stocks also testified that he complained in his April 1994 letter "about the ... lack of information regarding the viability of the interest as a going concern," and that he never received such information from Stern.

In his first deposition, Dialessi testified that he answered primarily to Berman, and that he was in contact with Stern "[v]ery rarely." He stated that Stern did not "direct any of [his] activities at any time"; that he did not "report to [Stern] individually or particularly at any time"; that Berman was the person "who [he] kept abreast of everything"; and that Stern did not attend weekly meetings at Berman's office.

This Court appoints Chapter 11 trustees most often for the reason that the Court has lost confidence in the debtor's management. The Court then reposits its confidence in the trustee. The duties of a Chapter 11 trustee are not delegable, even to counsel for the creditors' committee. Based on the evidence before the Court, it is unclear whether Stern's acts (or omissions to act), even if proven at trial, would constitute *gross* negligence by Stern. Nevertheless, this Court is bound to consider the evidence in the light most favorable to the non-moving party, and therefore concludes that there exist genuine issues of material fact as to whether Stern and Dialessi breached their respective duties of care to the estate. *See Kowal v. Malkemus (In re Thompson)*, 965 F.2d 1136, 1145 (1st Cir.1992) (Chapter 7 trustees are "charged with the fiduciary duty to administer the chapter 7 estate expeditiously in the best interests of the estate"); *Martin–Trigona v. Ferrari (In re WHET, Inc.)*, 750 F.2d 149, 149 (1st Cir.1984) (trustees "owe[ ] a fiduciary duty to debtor and creditors alike to act fairly and protect their interests").

Nonetheless, a demonstration of one or more breaches of the applicable standard of care matters little if the DiStefanos cannot demonstrate that the breaches proximately caused them the harm of which they now complain. Here, the DiStefanos' case completely breaks down.

JFD entered bankruptcy in financial distress, as presumably all debtors do. An examination of the Debtor's inventory levels while Mr. DiStefano was still acting as manager shows a steady downward progression,

beginning prepetition. In January 1993, six months prepetition, JFD's inventory was valued at $552,127.00, at cost. In September 1993, three months postpetition and just prior to Dialessi's entrance into the case, the value had fallen to $226,183.00, at cost. This represents a 50% erosion of inventory value in nine months, all of which occurred prior to Berman's alleged seizure of control and Dialessi's and Stern's involvement in the case. While the testimony of various parties reveals that there was a steady decline in customer count throughout the Chapter 11 proceeding (and in fact, before it), the Court has been presented with no evidence showing a precipitous drop that coincided with the commencement of Dialessi's management.

With respect to the possible overpayment of Dialessi, it cannot be seriously maintained that this overpayment, which would amount to less than $7,000 (assuming that Dialessi overpaid himself $150 per week) harmed the DiStefanos personally, without evidence demonstrating that the overpaid amount would have *either* been otherwise paid to the DiStefanos, even in light of the Bank's substantially undersecured claim, *or* altered the terms of Mr. DiStefano's ultimate settlement with the Bank on account of his personal guarantee. Further, in view of the Bank's substantial deficiency, it cannot be seriously maintained that the $7,000 would have flowed to the estate. And with respect to the alleged bulk wine sale described above, no evidence has been presented establishing that Dialessi sold a large quantity of wine for an unreasonably reduced price, other than Mr. DiStefano's conjecture.[27] As noted above, conjecture alone is insufficient to survive a summary judgment challenge.

Finally, the DiStefanos have submitted no evidence that either the failure to pay withholding taxes or Dialessi's use of the lottery account to pay employee wages ultimately harmed them or the estate, in view again of the Bank's substantial security shortfall. In fact, the DiStefanos have not disputed Dialessi's assertion that he personally settled a claim by the Internal Revenue Service against him regarding these taxes.

In reality, the heart of the DiStefanos' claims against these Defendants is that the Debtor failed under their management and they should be held accountable. However, the venerable doctrine of *res ipsa loquitur* has no application here; the DiStefanos cannot merely point to the failure of the Debtor and expect this Court to hold the Defendants liable.

Accordingly, even had the DiStefanos demonstrated standing and that the Defendants breached their respective duties, this Court would be compelled to grant the Defendant's motions for summary judgment on the basis that the DiStefanos failed to demonstrate a genuine issue of material fact tying any such breach to the losses which they or the estate suffered.

### III. *Conclusion*

For the foregoing reasons, the Defendants' motions for summary judgment are granted, and all remaining counts of the DiStefanos' complaint are dismissed.

---

**27.** Mr. DiStefano testified at his first deposition that the wine sold to Spence was worth "somewhere around $25,000." However, when questioned on the same subject at a subsequent deposition, the following colloquy ensued:

> Q. Okay. But you don't have any knowledge of facts to support that statement, correct?
> Mr. DiStefano: Wrong. I do. Because I know what was in the store. I know what we had for California boutiques. I knew we had tons of wine racks and aisles full of lay-down French, Spanish, Germans.
> Q. Those could have gone anywhere, right?
> Mr. DiStefano: They could have gone to Mr. Spence. He testified he took some.
> . . . .

> Q. . . . . You're speculating as to how much Mr. Spence walked off with, correct?
> Mr. DiStefano: Am I speculating? I know it was at least $2,000. By his admissions, it was [worth] at least twice that amount. . . .

As noted *supra* in part I.A, Mr. DiStefano also testified that he was told by two store employees that "all of the lay down wines" were sold in the Spence transaction. When pressed on whether the employees told him a more exact amount, he stated: "Regarding that one transaction, the only figure or quantity I can give you is a mountain. I don't know if it was a big mountain or a small mountain . . . ." The DiStefanos have not included transcripts from depositions, if any were conducted, of store employees.